<head>

<title>USCA1 Opinion</title>

<style type="text/css" media="screen, projection, print">

<!--

@import url(/css/dflt_styles.css);

-->

</style>

</head>

<body>

                                 

                 United States Court of Appeals
                     For the First Circuit
                      ____________________

No. 97-1777

                      MIGUEL TEJEDA, JR.,

                          Petitioner,

                               v.

                        LARRY E. DUBOIS,

                          Respondent.

                      ____________________

          APPEAL FROM THE UNITED STATES DISTRICT COURT

               FOR THE DISTRICT OF MASSACHUSETTS

          [Hon. Joseph L. Tauro, U.S. District Judge]

                      ____________________

                             Before

                     Stahl, Circuit Judge,

                   Cyr, Senior Circuit Judge,

and Shadur, Senior District Judge.  

                     _____________________

    John M. Thompson for petitioner.
    Susanne G. Levsen, Assistant Attorney General, with whom Scott
Harshbarger, Attorney General, was on brief for respondent.

                      ____________________

                        April 24, 1998
                      ____________________

         SHADUR, Senior District Judge.  Miguel Tejeda Jr.
("Tejeda") has filed a 28 U.S.C.  2254 ("Section 2254") petition
for a writ of habeas corpus ("Petition") that challenges his state
court conviction on three related criminal charges.  Tejeda
contends that his conviction must be overturned because he did not
receive constitutionally effective counsel at trial as required by
the Sixth Amendment.  That claim was rejected by the district
court, but for the reasons set forth below we reverse that
decision, vacate Tejeda's conviction and remand the case for entry
of an appropriate order.
                           Background  Tejeda was arrested on July 11, 1991 and charged with
trafficking in cocaine, unlawful possession of a firearm and
unlawful possession of a firearm or ammunition without an
identification card.  Shortly thereafter he was indicted by a
Hampden County, Massachusetts grand jury on those charges and was
brought to trial in Hampden Superior Court.  After Tejeda lost two
motions to suppress evidence, the trial commenced on December 9,
1991.  
    At trial the prosecution relied on five police witnesses
to build its case against Tejeda.  What follows in the next three
paragraphs is the officers' account of events, set out as factual
narrative without stating the qualification that it reflects their
testimony as the jury could be entitled to credit it.
    On the date of Tejeda's arrest Sergeant Charles Cook
("Cook") had supervised police surveillance of a house at 37 James
Street in Springfield, Massachusetts.  Tejeda lived in an apartment
on the first floor of the house.  After Cook learned that the
police had obtained a search warrant for the house (a warrant based
on a tip provided by a confidential informant), Cook observed
Tejeda leave the house, open the trunk of a car parked outside and
lean inside the trunk.  Tejeda then drove away in the car.   
    Cook followed Tejeda for a short distance and then
radioed Detective John O'Mara ("O'Mara") to stop the car.  O'Mara
stopped Tejeda several blocks away and searched the car.  O'Mara's
partner, Detective Dennis Kirby ("Kirby"), found a plastic bag in
the trunk that contained about 30 grams of white powder, which
proved to be cocaine, and $366 on Tejeda's person.  Kirby took
Tejeda to the police station after conducting the search.
    Shortly after the arrest, Cook and several other officers
searched Tejeda's apartment.  They found a loaded .38 caliber
revolver under a mattress, ammunition for the gun, personal papers
indicating that Tejeda lived in the apartment and a "drug ledger"
containing names and addresses of prospective drug clients.  Tejeda
did not have the requisite identification card for the firearm and
ammunition.
    In the face of such testimony, Tejeda's defense lawyer
Edelmiro Martnez, Jr. ("Martnez") concluded that Tejeda's only
defense was to argue that the police had fabricated the case
against Tejeda.  Martnez began his defense by trying to expose
inconsistencies in the police testimony during his cross-
examinations, but his efforts were completely unavailing because
the trial judge sustained numerous objections to Martnez'
questions suggesting potential police fraud.  Those rulings
hampered Martnez' pursuit of that line of inquiry.
    Martnez complained bitterly about the adverse rulings,
arguing that they prevented him from presenting his defense.  In
response the judge harshly warned Martnez not to present a police
fabrication defense supported only by Tejeda's word.  Those
contentious encounters generated an obvious hostility between
Martnez and the judge that poisoned their relationship for the
remainder of the trial.  Martnez, incensed by the judge's
consistently unfavorable rulings, acted out his frustration by
attacking the integrity of the judge.  Martnez' petulance in turn
antagonized the judge to the point that he fined Martnez $300 for
contempt of court after one outburst.
    That ongoing conflict discouraged Martnez' pursuit of
the police-fabrication line of defense.  He stopped trying to
cross-examine prosecution witnesses on that subject and
consequently failed to uncover significant inconsistencies that did
exist in Cook's and O'Mara's testimony.    
    In the end, the only evidence of police fabrication that
Martnez presented coherently came from Tejeda and one other
defense witness.  Tejeda vigorously denied having either drugs or
a gun in his car or apartment.  On the contrary, he testified that
he was going in his car to pay some bills when he was stopped at
gunpoint by the police.  Tejeda contradicted O'Mara, stating that
the car was not searched in Tejeda's presence.  Instead Tejeda said
that the police took him to the police station immediately and did
not inform him of the charges against him until the next day.  
Tejeda stuck to his story during the prosecution's cross-
examination, repeatedly insisting that the officers were lying.
    Tejeda's only substantive defense witness, Alejandro
Bonilla ("Bonilla"), claimed that he was Tejeda's roommate and that
he never saw drug trafficking or the gun in their apartment.  But
Bonilla's credibility was undermined when he admitted that he had
provided a different home address to the police (in the course of
a separate incident) two weeks before Tejeda's arrest.
    Despite Martnez' frenetic attempts to elicit evidence of
police fabrication, the trial judge concluded that there was no
evidence to support the inference that the police were lying.  
Accordingly, he explicitly prohibited Martnez from arguing that
theory in his closing statement.  While Martnez did not adhere to
that order with total strictness, his oblique references to
potential police fabrication were scattered and unsupported by
objective evidence of police misconduct.
    Not surprisingly, Martnez' failure to argue fully what
he had candidly admitted to be Tejeda's only line of defense
resulted in guilty verdicts against his client.  Tejeda was
convicted on all three charges and sentenced to a state prison term
of not less than five nor more than seven years.
    After filing a timely notice of appeal, Tejeda moved for
a new trial--a motion that was denied without a hearing.  When he
then appealed both his conviction and the denial of a new trial,
new counsel was appointed to handle the appeals.  Both his appeals
were consolidated for hearing before the Massachusetts Appeals
Court, and on February 18, 1994 the consolidated appeal was
rejected (Commonwealth v. Tejeda, 629 N.E.2d 370 (Mass. App. Ct.
1994)).  Tejeda's application to the Massachusetts Supreme Judicial
Court for further appellate review was denied on March 29, 1994
(Commonwealth v. Tejeda, 634 N.E.2d 121 (Mass. 1994)).
    Undeterred, Tejeda filed a petition for federal habeas
corpus relief on December 5, 1994.  Then he alleged in an amended
petition that he had received constitutionally ineffective
assistance at trial from Martnez and that the trial judge had
violated his right to counsel and due process by prohibiting
Martnez from arguing the police fabrication theory in his closing
argument.  On May 12, 1997 the district court issued a memorandum
opinion denying both claims.
    Tejeda then filed a Motion for Certificate of
Appealability as to both claims.  On July 23, 1997 the district
court issued a certificate of appealability for Tejeda's
ineffective assistance of counsel claim, but refused to grant a
certificate for the restricted summation claim.  This appeal
resulted from the issuance of the certificate.
                      Standard of Review
    As n.4 has indicated, Tejeda filed his federal habeas
petition on December 5, 1994, well before the April 24, 1996
effective date of the Act's amendments to Section 2254.  Lindh v. Murphy, 117 S. Ct. 2059, 2063 (1997) holds that the Act's more
stringent limitations on the federal courts' review of state court
determinations via habeas proceedings do not apply to petitions
pending before the Act became law.  Hence Tejeda is entitled to de
novo review of his ineffective assistance of counsel claim (Curtisv. Duval, 124 F.3d 1, 4 (1st Cir. 1997)).
          Ineffective-Assistance-of-Counsel Standards Tejeda claims that Martnez' performance at trial was so
deficient that it violated Tejeda's Sixth Amendment right to the
effective assistance of counsel.  To establish such a violation,
Strickland v. Washington, 466 U.S. 668, 687-96 (1984) requires that
Tejeda show (1) that Martnez' performance fell below an objective
standard of reasonableness and (2) that prejudice resulted.
    In evaluating Strickland's first component, we review
Martnez' actions with the strong presumption "that, under the
circumstances, the challenged action 'might be considered sound
trial strategy'" (id. at 689, quoting Michel v. Louisiana, 350 U.S.
91, 101 (1955)).  Accordingly, Tejeda must show that "in light of
all the circumstances, the identified acts or omissions were
outside the wide range of professionally competent assistance" (id.at 690).   
    As for the second element--prejudice flowing from
Martnez' substandard performance--Tejeda must demonstrate that
there was a reasonable probability that but for Martnez' errors
the outcome of the trial would have been different (id. at 694).  
For that purpose a reasonable probability is defined as "a
probability sufficient to undermine confidence in the outcome"
(id.).  And in that respect our analysis is not limited to outcome
determination--we must also contemplate "whether the result of the
proceeding was fundamentally unfair or unreliable" (Scarpa v. DuBois, 38 F.3d 1, 16 (1st Cir. 1994), quoting Lockhart v. Fretwell, 506 U.S. 364, 369 (1993)).  That consideration reflects
the fact that at its root the right to effective counsel exists "in
order to protect the fundamental right to a fair trial"
(Strickland, 466 U.S. at 684).

                 Application of the Standards
    Tejeda contends that Martnez' performance at trial
effectively deprived the jury of the chance to address his theory
that the police fabricated the evidence against him.  More
specifically, Tejeda argues that Martnez' inflammatory statements
and actions during trial led to a critical deterioration in the
lawyer's relationship with the trial judge, and that the
consequence of that mutual hostility between those two key players
was that Martnez failed to provide more than a fragmentary and
disjointed defense to the jury.
    Our review of the trial transcript confirms that Martnez
and the trial judge were like immiscible liquids:  They simply
could not tolerate each other.  Their relationship began to break
down from the moment that Martnez suggested in his opening
statement that the police had fabricated evidence against Tejeda,
and it ruptured completely when Martnez began to cross-examine
prosecution witnesses in ways that (if he had completed the line of
inquiry) could have raised doubts about the veracity of the
officers.  Those fledgling attempts to raise the idea of police
fabrication to the jury excited the wrath of the judge, who
promptly sustained prosecutorial objections to Martnez' line of
inquiry.  Martnez responded to those adverse rulings by
challenging the integrity of the judge and complaining that he was
not being treated fairly.  In turn, those attacks prompted the
judge to chastise Martnez about his behavior and to question the
propriety of the police fabrication defense itself.   
    One exchange that exemplifies the hostile dynamic between
Martnez and the trial judge took place during Martnez' cross-
examination of O'Mara, the first prosecution witness.  Martnez
asked O'Mara questions that implied that the officer had no reason
to stop Tejeda's car when he did--in turn implying that O'Mara
planted the evidence to cover his own mistake--but the judge
sustained a series of objections that allowed O'Mara to avoid
answering Martnez' questions.  Martnez criticized those rulings,
first asking "What kind of justice is that?" and then complaining
"your [sic] limiting me, I can't ask any questions."  Those attacks
prompted the judge to demand that Martnez outline the evidence he
thought supported his fabrication defense.  When Martnez suggested
that Tejeda's account alone would support an inference that the
police were lying, the judge retorted "You better have something
more than that."  After characterizing Martnez' proffer as
"absolutely outrageous," the judge warned Martnez "don't push
me...you overstep the bounds with me and you will know it."
    Martnez became incensed by the judge's attitude and
frequent rulings against him.  He repeatedly protested that the
judge was favoring the prosecution, even moving for a mistrial
because "I can't ask any questions. [The prosecutor] can ask
questions....I believe that I am not in the mood to continue this
case this way."  Martnez' remarks to the judge grew increasingly
acerbic as the lawyer's mood blackened.  Later rulings against
Martnez prompted him to make snide comments such as "I believe
that the best thing is for you to ask the jury to find him guilty
and that's it," and "It seems everything I do is improper."
    Martnez accompanied his acrimonious commentary with
outward displays of anger.  Parsing the trial transcript (a paper
record that cannot reproduce Martnez' hostile tone, manner and
body language, although those things plainly emerge from the
disputants' statements) reveals numerous occasions when Martnez
had to be told to lower his voice or to refrain from shouting,
including one instance where the judge exasperatedly asked that the
record reflect the fact that Martnez was yelling.  Nor was
Martnez' misconduct limited to the tone of his voice.  After one
adverse ruling the judge remonstrated Martnez, saying "I'm sick
and tired of you prancing around here, making all kinds of facial
expressions, raising your arms, throwing your papers."  
    Predictably, Martnez' comments and behavior further
antagonized the trial judge, whose loss of all patience with
Martnez' attitude was evidenced by the $300 contempt fine.  More
importantly, the judge's tolerance for the fabrication defense
dwindled as well.  By the end of the trial the judge began to
dismiss Martnez' police perjury arguments with out-of-hand
comments like "Mr. Martnez, argue with your brain" and "Don't
insult my intelligence."   
    There is no question that the disintegration of the
relationship between the trial judge and Martnez had a corrosive
effect on the presentation of Tejeda's fabrication defense to the
jury.  Martnez stopped trying to corroborate Tejeda's testimony
through cross-examination of the police witnesses, instead devoting
his energy to expressing his displeasure with the judge's rulings.  
As a result Martnez failed to make effective use of such internal
inconsistencies in the officers' testimony as these:
         1.  Cook included the cocaine and money in his search
    warrant return for the apartment, despite the fact that
    Kirby testified at trial that both items were found
    instead in the search of Tejeda's car.
         2.  Cook testified at trial that the police found a
    drug ledger in Tejeda's apartment, but Cook had made no
    mention of any such ledger in either his search warrant
    return or in his grand jury testimony.
         3.  Cook's grand jury testimony and the police arrest
    report placed the location of Tejeda's arrest at three
    different street intersections (including one non-
    existent address).
    To be sure, each of those differences (and one or two
other matters that we do not itemize) might be viewed instead as
reflecting sloppy police work, and the prosecutor would have been
entitled to urge that in closing argument to the jury.  But Tejeda
too was entitled to have his lawyer urge to the jury that the
discrepancies supported the graver conclusion of police misconduct.  
Defense counsel's argument drawing that inference from the evidence
could have lent critical support to Tejeda's otherwise
unsubstantiated version of the facts.
    Tejeda's cause also suffered as the trial judge's
contempt for Martnez and the fabrication defense grew.  By the end
of the trial, the judge mocked Martnez' attempts to use police
fabrication arguments.  One manifestation of that disdain was the
judge's conclusion that the "facts" presented at trial left "no
reasonable inference that the police fabricated any of the stories
that they testified to on the stand."  That led the judge
explicitly to forbid Martnez from arguing in his closing statement
that the police had planted evidence or were otherwise lying on the
stand.
    Thus hampered by the judge's warning (which was backed up
by the judge's oft-demonstrated willingness to sustain objections
to Martnez' advocacy), Martnez' final presentation of the
fabrication defense in his closing statement was neither coherent
nor complete.  In addition, Martnez' earlier failure to expose any
chinks in the police version of the facts left him with almost no
ammunition at the close.  As a result, his fabrication argument
depended heavily on Tejeda's testimony and on the naked assertion
that policemen sometimes lie in order to win cases.  Not
surprisingly, that impotent presentation of Tejeda's position fell
short of raising a reasonable doubt as to Tejeda's guilt in the
minds of the jury.
    Our extensive review of the trial transcript places us,
in cause-and-effect terms, in much the same position as a
basketball referee who sees a player throw an elbow at an adversary
but cannot tell if the blow was the initial foul or a retaliatory
strike.  Both Martnez and the trial judge clearly provoked each
other, making it difficult to unravel whether Martnez' petulance
or the trial judge's hostility first poisoned their relationship
and consequently made it impossible for Martnez to present
Tejeda's fabrication defense.
    But unlike the basketball referee, we have no need to
decide whether to assess a single foul or a double foul.  Instead
our constitutional focus is on defendant Tejeda--and he lost
regardless of which of the combatants initiated contact.  Either
way, Tejeda was deprived of his chance to present an effective
fabrication defense to the jury.
    It is thus unnecessary for us to attempt to divide the
blame between lawyer and judge.  What matters is that lawyer
Martnez failed to present Tejeda's primary line of defense to
either the judge or the jury.  It is not an answer to observe that
the trial judge's own actions appeared to contribute to that
failure.  Martnez' anger over the judge's rulings and attitude
simply prevented him from serving his client's interests.  That
cannot be characterized as trial strategy.  In sum, Martnez'
representation was so deficient that it falls below even the
minimal standard for professionally competent assistance
established by Strickland and its progeny, and it thus satisfies
the first half of the Strickland test.
    In terms of the second branch of the Strickland analysis,
it is impossible to conclude at any level of certainty whether, but
for Martnez' conduct, the jury would have decided that there was
enough evidence of police fabrication to raise a reasonable doubt
as to Tejeda's guilt.  Martnez' failure to present a coherent
argument on that score took the question away from the jury and
deprived Tejeda of his only defense.  Depriving a criminal
defendant of his only viable defense certainly renders the
resultant trial "fundamentally unfair or unreliable" as demanded by
Lockhart.  Hence Martnez' inadequate performance created
sufficient prejudice to satisfy Strickland's second requirement as
well, and his habeas petition must be granted.
                           Conclusion  Tejeda has demonstrated that Martnez' performance failed
to satisfy any objective standard of reasonableness and that Tejeda
suffered prejudice from that substandard performance.  That being
the case, Tejeda was deprived of his constitutional right to
effective assistance of counsel during his trial.  That renders it
unnecessary to address Tejeda's added claim based on an allegedly
restricted summation by Martnez.
    In terms of the appropriate remedy, the present record--
necessarily limited as it is to matters bearing on the issues
addressed in our opinion--provides no information as to such
questions as when Tejeda actually began to serve his five to seven
year sentence and, thus, what his anticipated out date is (giving
effect (1) to time spent in custody before the sentence itself
commenced and (2) to any good time credits Tejeda has earned while
in custody).  Because the nature of Tejeda's constitutional
deprivation was the absence of effective representation by counsel
rather than some incurable flaw, the usual relief granted to a
successful habeas petitioner such as Tejeda would be to give the
Commonwealth the choice of affording him a prompt new trial or
releasing him.  But in this instance the district judge is in the
best position on remand to determine the most appropriate relief.  
That may include a determination of what time period would be
required for the appropriate scheduling of a new trial, taking into
account both the reasonable preparation needs of the prosecution
and (more critically) the time needed for new defense counsel to
start from scratch and to prepare an effective defense.  It may
also be relevant for the district judge to consider whether
balancing (1) the timetable referred to in the preceding sentence
against (2) the time of Tejeda's presumptive release from custody
as things now stand might call for a straightforward order of his
current release, rather than affording the Commonwealth the more
common alternative described earlier in this paragraph.
    We therefore REVERSE the district judge's order, VACATE
Tejeda's conviction and REMAND for further proceedings consistent
with this opinion.

</body>

</html>