USCA1 Opinion

 

 _________________________ No. 96-1976 DANIEL J. CURTIS, Petitioner, Appellant, v. RONALD T. DUVAL, ET AL., Respondents, Appellees. _________________________ APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE DISTRICT OF MASSACHUSETTS [Hon. Douglas P. Woodlock, U.S. District Judge] _________________________ Before Selya, Circuit Judge, Campbell, Senior Circuit Judge, and Lagueux,* District Judge. _________________________ Wendy Sibbison for appellant. Gregory I. Massing, Assistant Attorney General, Commonwealth of Massachusetts, with whom Scott  Harshbarger, Attorney General, was on brief, for appellees. _________________________ August 13, 1997 _________________________ _____________ *Of the District of Rhode Island, sitting by designation. SELYA, Circuit  Judge. Petitioner-appellant Daniel J. Curtis, a state prisoner serving a life sentence for second-degree murder, challenges the constitutionality of his conviction. He asseverates that three occurrences _ the absence of counsel when the trial judge delivered a supplementary jury instruction, the fact that the supplementary instruction impermissibly shifted the burden of proof, and the trial court's refusal to immunize a potential defense witness _ abridged his constitutional rights. The district court declined to issue a writ of habeas corpus. We affirm. I. PROCEDURAL HISTORY A Suffolk County (Massachusetts) jury convicted the petitioner of second-degree murder on December 30, 1980, and the trial judge sentenced him to life imprisonment. The Massachusetts Supreme Judicial Court (SJC) turned down the petitioner's initial appeal, in which he argued that the trial court had transgressed his rights to due process and compulsory process under the Sixth and Fourteenth Amendments when it refused to immunize a prospective defense witness. See  Commonwealth v.  Curtis, 448 N.E.2d 345 (Mass. 1983) (Curtis I). Six years later, the petitioner filed a motion for new trial and raised for the first time two additional issues, both of which concerned the trial court's rendition of a supplementary jury instruction. The state superior court denied the motion and the SJC affirmed. See Commonwealth v. Curtis, 632 N.E.2d 821 (Mass. 1994) (Curtis II). On April 12, 1995, the petitioner docketed an application 2 for habeas relief in the United States District Court for the District of Massachusetts, naming as respondents various state officials (who, for ease in reference, we refer to as "the Commonwealth"). In due course, the district court wrote a thoughtful opinion in which it refused to issue the writ. See Curtis v. Duval, Civ. No. 95-10758-DPW (D. Mass. July 11, 1996) (unpublished). This appeal followed. II. FACTUAL BACKGROUND We sketch the evidence relevant to this appeal, referring readers who hunger for greater detail to the SJC's fuller accounts. See Curtis II, 632 N.E.2d at 824-26; Curtis I, 448 N.E.2d at 346- 48. We propose to describe the pertinent procedural aspects of the petitioner's trial when we address his specific claims. On the evening of July 14, 1980, Michael Robinson was severely beaten in a confrontation between a group of East Boston youths and a number of sailors. He died eight days later from head injuries. The origin of the fracas is obscure. Its genesis apparently lies in an encounter between Lenny Curtis, the petitioner's brother, and four black sailors who were lounging outside the perimeter fence of an East Boston shipyard. Witnesses gave conflicting testimony about what transpired. Lenny Curtis testified that one of the sailors struck him when he rebuffed a request for a cigarette. A sailor testified that Lenny Curtis strolled by them unmolested but gave them "hard looks." In any event, when Lenny Curtis spotted his friend, Eddie 3 Colon, riding a bicycle, he told Colon to scat and "get my two brothers." Word of the brewing storm spread. Soon the four black sailors were joined by several white sailors, including Robinson, while between twelve and twenty East Boston youths assembled in apparent opposition. Some of the youths reportedly hurled racial epithets. When the petitioner arrived at the scene by car, someone told him that the sailors had assaulted his brother. A full-scale brawl erupted soon thereafter. Witnesses disagreed over the petitioner's role. According to some accounts, the sailors fled from the youths. On this version, Robinson either tripped or was pushed to the ground. Seaman Webb testified that he saw the petitioner hit a supine Robinson over the head with a baseball bat three times. Other witnesses testified that there were multiple assailants. Lenny Curtis told a very different story. He said that when his brother approached Robinson, Robinson swung a bottle at him. The petitioner ducked, punched Robinson, and then backed away as Robinson fell to the ground. Lenny Curtis stated that he saw three or four other persons attack Robinson with bats and sticks as Robinson lay prostrate (whereupon the Curtis brothers skedaddled). III. STANDARD OF REVIEW The Antiterrorism and Effective Death Penalty Act (AEDPA), 28 U.S.C.A. S 2254(d) (Supp. 1997), became law on April 24, 1996 _ after the petitioner filed his habeas petition but before the district court acted upon it. Although the AEDPA alters 4 the standard of review governing the issuance of writs of habeas corpus, the Supreme Court has determined that the AEDPA does not apply to habeas petitions which were pending when the AEDPA became law. See  Lindh v.  Murphy, No. 96-6298, 1997 WL 338568, at *8 (U.S. June 23, 1997). The petitioner is therefore entitled to de novo review of his claim that the state court abridged his constitutional rights. See  Martin v.  Bissonette, ___ F.3d ___, ___ (1st Cir. 1997) [No. 96-1856, slip op. at 7-8];  see  also  Scarpa v. Dubois, 38 F.3d 1, 9 (1st Cir. 1994) (explaining that federal courts, although respecting state courts' findings of historical fact, traditionally afford de novo review in regard to ultimate questions presented by state prisoners' habeas petitions), cert. denied, 513 U.S. 1129 (1995). IV. THE MERITS We turn now to the three claims that are before us. We discuss them seriatim. A. Deprivation of Counsel. The basic facts pertinent to the petitioner's argument that he was deprived of his Sixth Amendment right to the effective assistance of counsel are as follows. The petitioner's trial wound down on December 29, 1980. On that date, final arguments were made and the trial court charged the jury. Deliberations began the next morning. At 2:00 p.m. on December 30, the trial judge conducted a chambers conference. He stated at the outset that he had tried unsuccessfully to locate the petitioner's attorney for at least twenty minutes. 5 At 3:14 p.m., notwithstanding that the missing lawyer still had not surfaced, the judge ordered the jury returned to the courtroom and, acting  sua  sponte, gave a supplementary instruction anent the lesser included offense of manslaughter. The jury found the petitioner guilty of second-degree murder at 3:55 p.m. The petitioner's paramount claim is that the judge's actions deprived him of counsel at a critical stage of the proceedings. He cites United States v. Cronic, 466 U.S. 648, 659 (1984), as authority for the concept that, when such a deprivation occurs, it constitutes a structural error which makes the trial presumptively unfair and requires automatic reversal on habeas review. On this basis, he maintains that the state court's action unleashed a presumption of prejudice per se, which entitles him to habeas relief. Cronic and its progeny do indeed stand for the proposition that the actual or constructive denial of counsel at a critical stage of a criminal trial constitutes prejudice per se and thus invalidates a defendant's conviction.  See  Perry v.  Leeke, 488  The supplementary instruction stated in pertinent part: Now in case you are wondering about the manslaughter, remember that I told you that the only set of facts, if you believe them, that would warrant a manslaughter verdict would be the instance that I recalled to your mind if one of the witnesses _ I think it was Curtis' brother testified that the sailor was the aggressor, that is, that he swung a bottle at Mr. Curtis first, and that, then, if Curtis used what you feel was unreasonable force in defending himself that it would warrant a verdict of manslaughter against Curtis. 6 U.S. 272, 278-79 (1989); Penson v. Ohio, 488 U.S. 75, 88 (1988). It is apodictic that the right to counsel is not honored for its own sake, but rather because it ensures the accused a fair trial. The Cronic Court reaffirmed this aphorism, but recognized that, because of the presumption that counsel's assistance is essential, the denial of counsel at a critical stage renders an otherwise acceptable trial unfair. See Cronic, 466 U.S. at 659. The petitioner is also correct when he asserts that recalling the jury for supplementary instructions after deliberations are underway is a critical stage of a criminal trial. See  Rogers v.  United States , 422 U.S. 35, 38-39 (1975);  Siverson v. O'Leary, 764 F.2d 1208, 1214 (7th Cir. 1985). It is evident to us that giving a sua sponte jury instruction without consulting, and in the absence of, the defendant's attorney, as occurred here, denies the defendant the assistance of counsel at that critical stage. See United States v. Parent, 954 F.2d 23, 25-26 (1st Cir. 1992). And although this deprivation was short-lived, it occurred during a vital point in the trial and was, within its terms, total. Therefore, were we to apply Cronic, Penson, and Parent, we would hold that the error required reversal. In a habeas proceeding, however, special protocols prevail. Under one such protocol, "new constitutional rules of criminal procedure will not be applicable to those cases which have become final before the new rules are announced." Teague v.  Lane, 489 U.S. 288, 310 (1989) (plurality). Although this protocol would seem to have a bearing on 7 the disposition of Curtis' habeas petition, there is a procedural glitch. The Commonwealth has not explicitly relied on Teague, and the district court decided the issue on other grounds. Moreover, the  Teague paradigm is not jurisdictional in the sense that a court is obliged to raise the point on its own initiative. See Collins v.  Youngblood, 497 U.S. 37, 41 (1990). Thus, by failing either to cite Teague or to rely on its rationale in connection with the petitioner's Sixth Amendment claim, the Commonwealth forfeited the right to insist that we recognize this potential line of defense. See id. Withal, an appellate court possesses the authority to raise the Teague issue on its own initiative if it believes that doing so will further the ends of justice. See  Caspari v.  Bohlen, 510 U.S. 383, 389 (1994). We recognize that this power must be used judiciously, and that many factors enter into the decisional calculus. Here, the interests of comity and orderly procedure loom large. Thus, we choose to invoke Teague. To apply the paradigm of nonretroactivity required by Teague, we must determine when the petitioner's conviction became final and "whether a state court considering [the petitioner's] claim at the time his conviction became final would have felt compelled by existing precedent to conclude that the rule [he] seeks was required by the Constitution."  Saffle v.  Parks, 494 U.S. 484, 488 (1990). If the answer to this inquiry is in the negative, the petitioner may benefit from the new rule only if it falls within one of two isthmian exceptions. The first exception is 8 operative only "if the rule places a class of private conduct beyond the power of the State to proscribe," and the second only if the rule is a "`watershed rule[] of criminal procedure' implicating the fundamental fairness and accuracy of the criminal proceeding." Lambrix v. Singletary, 117 S. Ct. 1517, 1531 (1997) (citations omitted). The petitioner's conviction became final in 1983. Accordingly, the threshold question is whether a state court, at that time, would have felt compelled to adopt the  Cronic principle that a deprivation of counsel during a critical stage amounts to prejudice per se and thus mandates automatic reversal. We think not. We acknowledge that by 1983 it long had been established that the Sixth Amendment right to assistance of counsel attaches at all critical stages of the prosecution. See, e.g., Simmons v. United States , 390 U.S. 377, 382-83 (1968). Although this general precept was quite clear, it was by no means settled in 1983 what remedy a court should employ to redeem a violation of the right to counsel. On the one hand, the Court had stated that "there are some constitutional rights so basic to a fair trial that their infraction can never be treated as harmless error," Chapman v. California, 386 U.S. 18, 23 (1967), and had cited a deprivation-of- counsel case, Gideon v. Wainwright, 372 U.S. 335 (1963), as authority for that statement. On the other hand, hot on the heels of Chapman, the Court remanded a case for harmless error analysis after finding that the petitioner had been denied counsel at a 9 critical stage of the prosecution. See  Gilbert v.  California, 388 U.S. 263, 272 (1967) (involving the denial of the right to counsel at a post-indictment pretrial lineup). We harmonize this dissonance by concluding that the Chapman Court was referring to a wholesale denial of counsel, whereas the  Gilbert Court was referring to a short-term, localized denial of counsel. This interpretation receives a measure of confirmation from subsequent opinions in which the Court conducted, or ordered lower courts to conduct, harmless error analysis in response to an isolated deprivation of counsel at a critical stage of a criminal trial, yet refused to countenance such analysis when the right was denied throughout the proceedings in their entirety. Compare  Moore v.  Illinois, 434 U.S. 220, 232 (1977) (remanding for harmless error analysis after denial of assistance of counsel at a preliminary hearing)  with  Holloway v.  Arkansas, 435 U.S. 475, 490- 91 (1978) (rejecting harmless error analysis in a case involving joint representation of conflicting interests). Any residual doubt about whether a state court judge would have felt propelled to presage Cronic's prejudice per se principle is purged by United  States v. Morrison, 449 U.S. 361 (1981). There the Court, after remarking "society's interest in the administration of criminal justice," stated that "[c]ases involving Sixth Amendment deprivations are subject to the general rule that remedies should be tailored to the injury suffered from the constitutional violation and should not unnecessarily infringe on competing interests." Id. at 364. Bearing this preference for 10 proportionality in mind, the Court declared that, depending on the nature of the transgression, "certain violations of the right to counsel may be disregarded as harmless error." Id. at 365. Given the weight and direction of these precedents, we do not believe that a state court in 1983 would have felt that Sixth Amendment jurisprudence compelled the adoption of the principle established a year later by the Supreme Court's opinion in  Cronic. Consequently, we conclude that Cronic announced a "new rule" as that term is understood in the Teague context. Since the Cronic principle does not fall into either of the Teague exceptions, the petitioner's position erodes. The principle does not place any conduct beyond the power of the state to regulate, and it does not implicate the fundamental fairness or accuracy of a criminal proceeding. Thus, under Teague, the petitioner is not entitled to rely on the principle announced in Cronic. We turn, therefore, to the petitioner's contention that he was actually prejudiced due to the transitory absence of his lawyer. Before launching into this examination, we are constrained to note that for six years no one intimately involved in the petitioner's trial apparently thought that counsel's absence during the supplementary instruction had been injurious enough to mention on direct review or more coeval collateral review. Although this observation is by no means dispositive, it does provide useful information as to the contemporaneous perception of prejudice as we today inquire into possible harmfulness. 11 On collateral review, the standard for harmless error analysis, which derives from Kotteakos v. United States, 328 U.S. 750 (1946), affords relief only when the error "had substantial and injurious effect or influence in determining the jury's verdict." Brecht v. Abrahamson, 507 U.S. 619, 638 (1993) (quoting, without attribution,  Kotteakos, 328 U.S. at 776). Applying this criterion, we find that the effect of this error was neither substantial nor injurious, and that, therefore, the error was harmless. To determine whether the Sixth Amendment violation had a substantial or injurious effect, we focus primarily on the fruit of that violation: the supplementary instruction as given. The petitioner argues that the instruction was harmful for three related reasons: the trial court's supplementary charge was unconstitutional; the flawed instruction improperly induced the jury's verdict; and counsel's absence deprived the petitioner of any opportunity to influence the wording of the instruction. Finding none of these plaints persuasive, we hold the error to have been benign. The petitioner's first complaint need not detain us. We explain fully in Part IV(B), infra, why the supplementary instruction conformed with the applicable legal norms, and it would be pleonastic to rehearse that discussion here. It suffices to say at this juncture that the petitioner was not prejudiced on this account. This conclusion also dooms the petitioner's second contention. As long as the instruction passes muster from a legal 12 standpoint, the fact that it may have helped to persuade the jury is unremarkable. See United States v. Nichols, 820 F.2d 508, 512 (1st Cir. 1987). Moreover, we cannot accept the petitioner's brazen assumption that because the jury returned its verdict a half hour after hearing the supplementary instruction, the instruction must have had some effect. The judge offered the instruction sua sponte. Thus, we cannot infer that the jury was even concerned with the subject matter of the supplementary instruction. Because we can only speculate about the correlation, if any, between the giving of the supplementary instruction and the timing of the verdict, it cannot fairly be said that the instruction had any impact, let alone a substantial impact, or that it was injurious. This leaves us with the last argument. Citing Parent, the petitioner claims that he was undone by his attorney's absence because, whether or not the supplementary instruction was correct, he missed the opportunity to persuade the judge that some different language might have been more appropriate.  See  Parent, 954 F.2d at 26 (finding denial of counsel to be reversible error on direct appeal because "defense counsel was powerless to prime the pump of  This case is unlike Rogers v. United States, where the jury returned a verdict five minutes after the court replied affirmatively (without consulting counsel) to a question from the jury about whether it would accept a particular verdict. See 422 U.S. at 36-37. When a jury indicates that it thirsts for knowledge on a particular point and the court subsequently slakes that thirst, the inference can reasonably be drawn that the court's input had a causal effect on a verdict returned within minutes of the court's action. The situation is vastly different where, as here, the jury never indicated an interest in the subject matter of the sua sponte supplementary instruction. 13 persuasion"). To the extent that this argument is of constitutional dimension, it strives to redeem the intangible might-have-been; after all, a harm that cannot be quantified, cannot be identified. Unfortunately for the petitioner, this Parent harm is the same harm addressed by the prejudice per se principle, and as such its application is also barred by Teague. In this case, all roads lead to Rome. Because of the nonretroactivity paradigm, the brief deprivation of counsel which occurred at trial some seventeen years ago, while lamentable, does not constitute a lever that can be used on collateral review to overturn the petitioner's conviction. B. Supplementary Jury Instruction. Due process requires that the government prove every element of a criminal offense beyond a reasonable doubt. See Francis v. Franklin, 471 U.S. 307, 309 (1985); Sandstrom v. Montana, 442 U.S. 510, 522-24 (1979). In Anderson v. Butler, 23 F.3d 593 (1st Cir. 1994), we described a three-pronged framework to be used in analyzing burden-shifting claims: [A] reviewing court must first determine whether a reasonable juror would have interpreted the challenged portion of the instruction as creating a mandatory presumption. If so, the court must then consider whether other parts of the charge clarified the ill-advised language with the result that a reasonable factfinder would not have understood the instruction to create an unconstitutional presumption. Finally, if the court determines that the charge as a whole left the jurors with an impermissible impression, the court must proceed to evaluate the harmlessness vel non of the error. Id. at 595 (citing  Hill v.  Maloney, 927 F.2d 646 (1st Cir. 1990)). 14 We will assume here that Lenny Curtis' testimony that Robinson initiated the fracas by swinging a bottle at the petitioner provided a basis for a claim of self-defense. Under Massachusetts law, once the issue of self-defense has been fairly raised, the jury should [be] instructed on the legal consequences of using manifestly disproportionate violence in the supposed exercise of the right of self-defense. If the jury [conclude] that [the defendant] had the right to use force to defend himself but that the force used was excessive . . . they would [be] warranted in finding [the defendant] guilty only of manslaughter. Commonwealth v. Johnson, 589 N.E.2d 311, 313 (Mass. 1992) (citations and internal quotation marks omitted) (alterations in original). The petitioner posits that the court's supplemental jury instruction, quoted supra note 1, unconstitutionally shifted the burden to him to prove self-defense by telling the jurors in effect that they must believe Lenny Curtis' testimony in order to return a manslaughter verdict. We disagree with this assessment. We start with the first prong of the three-pronged test. Although this supplementary instruction is not artfully phrased, we believe that no reasonable juror would interpret it as creating a mandatory presumption. To the contrary, we agree with the district court that a reasonable juror probably would have understood this instruction as clarifying the circumstances which would, if proved beyond a reasonable doubt by the prosecution, warrant a manslaughter conviction. The second prong of the test also favors the 15 Commonwealth. On whole-record review, it seems highly likely that any prospect of confusion vis-a-vis the supplementary instruction vanishes when the instruction is considered in conjunction with the main charge. During the main charge the superior court judge explicated Massachusetts law clearly, accurately, and succinctly, telling the jury, inter alia, that "the defendant does not have to convince you that he acted in self-defense. The Commonwealth has to convince you that he did not, or that he used excessive force." In addition, the judge cautioned the jury that: [I]f I refer to any of the evidence, it will be by way of example only in order to make the law a little easier for you to understand and to apply, and I in no way intend or infer that you are to give any more weight, place any more importance, and more credibility on a particular piece of evidence that I may mention in the course of the charge than on all the other evidence in the case. In light of these instructions, we believe that a reasonable juror would have understood that, through the supplementary instruction, the trial court sought merely to facilitate the jury's understanding of the applicable law. The petitioner also objects to another portion of the supplementary charge: a portion which linked a manslaughter verdict for him to one for his codefendant, Giglio (another East Boston youth convicted of second-degree murder). In particular, he complains about the statement: "If there is any manslaughter  Since we do not believe that there is any appreciable risk that the supplementary charge confused the jurors or left them with an incorrect impression, the third prong of the  Anderson test need not concern us. 16 verdict in the Giglio case there has to be two of them." The vice in this statement, the petitioner says, is that it led the jury to believe that, in order to be found guilty of the lesser included offense, Curtis had the burden to prove that Giglio too was guilty only of manslaughter. The petitioner's contention tortures the trial court's statement and distorts its meaning. This portion of the supplementary charge states that in order to find Giglio guilty of manslaughter, the jury must first find Curtis guilty of manslaughter. See  Curtis II , 632 N.E.2d at 829. It neither states nor implies the converse: that in order to find Curtis guilty of manslaughter, the jury must first find Giglio guilty of manslaughter. The latter statement would have been incorrect, but the former statement merely fleshed out a specific theory of manslaughter in coming to the aid of another, touched upon in the main charge.  This portion of the supplementary charge addressed the use of excessive force in self-defense by the petitioner: I told you that if you find that happened, and that Giglio was helping him defend himself and used excessive force, but that it was the bat, not a bottle that caused the death, there could be a manslaughter verdict in the case of Giglio only if there is a manslaughter verdict in the case against Curtis, that is, the idea of the joint enterprise being that Giglio would have been aiding Curtis' self-defense effort, and then if Curtis used excessive force and was found guilty of manslaughter, then Giglio could also be found guilty of manslaughter. But if there is any manslaughter verdict in the Giglio case there has to be two of them. 17 To say more would be supererogatory. Because we discern no constitutional error in the trial court's supplementary jury instruction, we reject the petitioner's second claim. C. Refusal to Grant Immunity. At trial, the petitioner attempted to call as a defense witness Joseph DeDominicis, one of the youths present during the brawl. DeDominicis refused to testify on Fifth Amendment grounds. The petitioner asked the court to immunize the witness, alleging that DeDominicis would then testify that he saw a person named Muzzone standing over the victim with a bat in his hand. The prosecution opposed the grant of immunity, asserting that it would interfere with an ongoing grand jury investigation. The trial court declined the request and the SJC affirmed.  See  Curtis I , 448 N.E.2d at 348-50. The petitioner's claim that he was entitled to DeDominicis' immunized testimony encompasses both the "effective defense" theory _ which draws its essence from the Sixth Amendment right to compulsory process _ and the "prosecutorial misconduct" theory _ which draws its essence from the Fourteenth Amendment right to due process. See  United States v.  Angiulo, 897 F.2d 1169, 1190-93 (1st Cir. 1990) (limning both theories). On these facts, neither approach takes wing. The effective defense theory originated in the Third  We note that this testimony, even if credited, would not have been wholly exculpatory; some witnesses testified that they saw two batsmen. 18 Circuit. See Virgin Islands v. Smith, 615 F.2d 964, 974 (3d Cir. 1980). Under its mantra, a trial court has the power to grant immunity based on a defendant's need to present exculpatory evidence. See  id. Thus, a trial court should grant immunity "when it is found that a potential defense witness can offer testimony which is clearly exculpatory and essential to the defense case and when the government has no strong interest in withholding use immunity." Id. Notwithstanding the Third Circuit's pronouncement, the effective defense theory has been roundly rejected by other courts, most of which have agreed that the power to grant immunity properly belongs to the Executive Branch. See, e.g., United  States v. Quintanilla, 2 F.3d 1469, 1483 (7th Cir. 1993); In  re  Grand  Jury Proceedings  (Williams), 995 F.2d 1013, 1017 (11th Cir. 1993); United States v.  Tindle, 808 F.2d 319, 325 (4th Cir. 1986);  United States v. Pennel, 737 F.2d 521, 526-29 (6th Cir. 1984); United States v. Turkish, 623 F.2d 769, 773-74 (2d Cir. 1980). We, ourselves, in a case decided only recently, explicitly rejected the effective defense theory. See United  States v. Mackey, ___ F.3d ___, ___ (1st Cir. 1997) [No. 94-2264, slip op. at 8] (stating that, "in general, courts have no power to compel immunity in the face of a good faith refusal by the prosecutor [to grant it]").  To be sure, we added in Mackey that an occasional exception perhaps "might exist upon very extreme facts."  Mackey, ___ F.3d at ___ [slip op. at 8]. The case at hand certainly is no stronger than Mackey from the defense standpoint. Consequently, it comes within the general rule, not within the hypothetical exception to that rule. 19 The prosecutorial misconduct theory fares no better here. That theory is grounded in the notion that "the due process clause [constrains] the prosecutor to a certain extent in her decision to grant or not to grant immunity." Angiulo, 897 F.2d at 1191. But this constraint comes into play only when a prosecutor "intentionally attempt[s] to distort the fact-finding process." Id. A defendant can demonstrate such distortion in two ways: by showing an attempt to harass or intimidate potential witnesses, or by showing that the prosecutor deliberately withheld immunity for the purpose of hiding exculpatory evidence from the jury. See  id. at 1192. Neither of these circumstances obtain here. The petitioner does not argue, and there is no evidence to suggest, that the prosecutor sought to silence DeDominicis through harassment or intimidation. And although the petitioner does argue that the prosecution intended to withhold exculpatory evidence from the jury, this argument comprises sheer speculation. On this record, we cannot peer behind the prosecution's plausible assertion of a legitimate interest in keeping the way clear for a possible future prosecution of DeDominicis. See Mackey, ___ F.3d at ___ [slip op. at 7-8]; Turkish, 623 F.2d at 776-77. Hence, the petitioner's professed reliance on the prosecutorial misconduct theory is unavailing. V. CONCLUSION We need go no further. We have inspected the petitioner's asseverational array and found it wanting. There is 20 no sound basis for granting a writ of habeas corpus. Affirmed. 21