**Walter L. THOMAS, Petitioner–Appellant,**

**v.**

**Jerry GILMORE, Warden, Pontiac Correctional Center, Respondent–Appellee.**

No. 97–1854.

United States Court of Appeals, Seventh Circuit.

Argued Feb. 18, 1998.

Decided May 15, 1998.

Rehearing and Suggestion for Rehearing En Banc Denied June 29, 1998.

Mark Latham (argued), Gardner, Carton & Douglas, Chicago, IL, Marshall J. Hartman, Capital Resource Center, Chicago, IL, Alan M. Freedman, Midwest Center for Justice, Chicago, IL, for Petitioner–Appellant.

Penelope Moutoussamy George (argued), Office of Attorney General, Criminal Appeals Division, Chicago, IL, for Respondent–Appellee.

Before POSNER, Chief Judge, and CUMMINGS and RIPPLE, Circuit Judges.

POSNER, Chief Judge.

Walter Thomas was convicted in an Illinois state court in 1987 of murder, burglary, and aggravated arson, and was sentenced to death. After exhausting his state remedies, see *People v. Thomas*, 137 Ill.2d 500, 148 Ill.Dec. 751, 561 N.E.2d 57 (1990); *People v. Thomas*, 164 Ill.2d 410, 207 Ill.Dec. 490, 647 N.E.2d 983 (1995), he sought federal habeas corpus; lost, 951 F.Supp. 1338 (N.D.Ill.1996); and appeals. His principal challenge is to the adequacy of his lawyer at the sentencing hearing, and we begin there.

The victim discovered Thomas, a 31–year–old employee of a cleaning service that she used, stealing perfume from her garage, which he had broken into, and in which she had stored a large quantity of perfume. Thomas (who admitted to his boss previous burglaries from the garage) stabbed the victim 12 times, killing her, then poured perfume over her body, the floor of the garage, and the car that was parked in the garage, and lit the perfume in an effort to obliterate the traces of the crime. The garage was in a condominium complex that might have gone up in flames had the car exploded. After the murder, Thomas resumed his normal routine, acting as if nothing had happened. He discarded the murder weapon and cleaned his blood-stained sweater, and, when arrested, at first denied his guilt, though eventually he confessed.

Because the murder was committed in the course of committing another felony, Thomas was eligible under Illinois law for the death penalty. 720 ILCS 5/9–1(a)(6), formerly Ill. Rev.Stat.1985 ch. 38, para. 9–1. At his sentencing hearing the jury heard evidence of both aggravating and mitigating factors. 720 ILCS 5/9–1(c), (g). The prosecution emphasized Thomas's criminal history. Thomas had been convicted of six prior assaults on women, primarily involving attempts at knifepoint to rob and sexually assault them. In one of these cases he raped the woman three times and also stabbed her. (The rape victim testified at the sentencing hearing.) In another he carjacked the woman and at knifepoint tried to get her to drive to a secluded area; she deliberately collided with another car and, eluding his knife thrust, fled. (She also testified.) Thomas had struck one of his teachers with a table leg. He had committed this and three other of his offenses when he was a juvenile. When questioned in connection with the murder, he dismissed his previous offenses as a joke. He exhibited no remorse either for those offenses, which he attributed to his desire to prove his manhood, or for the murder.

In preparing the case in mitigation—a preparation begun a year before the sentencing hearing—Thomas's lawyer interviewed Thomas, his mother, his former live-in girlfriend, and other friends and relatives. The lawyer asked them whether he had any history of psychological problems, and all of them

including Thomas denied that he did. She hired a psychologist who prepared a narrative of Thomas's life but did not (so far as anyone can recall) recommend that he undergo a psychiatric examination. The lawyer did not subpoena Thomas's prison or school records. That was not done until, in the postconviction proceedings, new counsel for Thomas hired another mitigation expert. This time the records were searched, and they showed that Thomas was of low average intelligence (his I.Q. was in the range of 81 to 85), that he was emotionally disturbed, that he had "schizoid tendencies" and a "paranoid personality," and that he had a learning disability—and might have organic brain damage—as a result of having had scarlet fever and two falls as a youth. Armed with these records, Thomas's new counsel reinterviewed Thomas's family and friends and learned that his mother had beaten him and his siblings with an extension cord when they were children, that his father had been alcoholic, and that his parents had fought with each other in front of the children.

The evidence presented in mitigation at the sentencing hearing consisted of testimony by Thomas's friends and relatives that he was a good person and that the murder was an inexplicable deviation from his normal behavior. His former girlfriend testified that she had lived with him for four or five years and he had never been violent to her or her daughters, and that the Walter Thomas whom she knew (and was continuing to visit in prison) could not have committed the murder or other crimes that Thomas had committed. The other defense witnesses testified in similar vein. His mother testified that a police officer had told her that if Thomas (who denied committing the murder) would confess he would not be sentenced to death, and this was the part of the mitigation testimony that the lawyer emphasized in her closing argument.

■ Thomas argues that his trial lawyer's failure to subpoena his prison and school records, which would have revealed serious psychological problems, demonstrated that the lawyer failed to provide him with even minimally competent representation. In a death case, the defendant's lawyer is re-

quired to conduct a reasonable investigation into the possibilities for proving mitigating factors, *Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984); *Kubat v. Thieret*, 867 F.2d 351, 369 (7th Cir.1989); *Cargill v. Turpin*, 120 F.3d 1366, 1385 (11th Cir.1997); *Porter v. Singletary*, 14 F.3d 554, 557 (11th Cir.1994), factors that might persuade the jury not to impose the death penalty. A reasonable investigation is not, however, the investigation that the best criminal defense lawyer in the world, blessed not only with unlimited time and resources but also with the inestimable benefit of hindsight, would conduct. *Kokoraleis v. Gilmore*, 131 F.3d 692, 696 (7th Cir. 1997); *Stewart v. Gramley*, 74 F.3d 132, 135 (7th Cir.1996); *Waters v. Thomas*, 46 F.3d 1506, 1514 (11th Cir.1995); *White v. Singletary*, 972 F.2d 1218, 1220 (11th Cir.1992).

■ It is reasonable for a lawyer to place a certain reliance on his client, so that if the client and his family and friends throw the lawyer off the scent, here by denying the existence of psychological problems that might have provided an alternative theory of mitigation, the lawyer cannot be faulted for failing to go down the path thus closed off. *Strickland v. Washington, supra,* 466 U.S. at 691, 699, 104 S.Ct. at 2066–67, 2070–71; *Kokoraleis v. Gilmore, supra,* 131 F.3d at 697; *Stewart v. Gramley, supra,* 74 F.3d at 135; *LaRette v. Delo*, 44 F.3d 681, 685 (8th Cir. 1995); *Whitmore v. Lockhart*, 8 F.3d 614, 621 (8th Cir.1993). Thomas's lawyer was led to believe that Thomas was a normal person from a warm close-knit family, a man who held a steady job, was not violent, and whose crimes were therefore aberrant and did not mark him as irredeemably evil. His criminal history, however, drew the profile of a sexual predator, and sex criminals are often emotionally disturbed people. It would have been easy for Thomas's lawyer to subpoena his prison and school records and to submit them for evaluation by a psychiatrist. Since the "nice guy" evidence was not powerful— the lawyer herself placed little emphasis on it in her closing argument, instead emphasizing the state's alleged promise to Thomas's mother that if he confessed he would be

spared—the felt incentive to find an alternative line of defense should have been great.

Thomas's brief might be read as asking us to lay down a per se rule that capital defendants' lawyers must always, or at least in all cases in which sex may have been an element in the murder (may have, for there is no evidence, even after the second mitigation investigation, of a sexual element in the murder, unlike the case of Thomas's previous crimes), subpoena all available institutional records. Such a rule would be a long step down the path that leads to the courts' laying down a rigid protocol that criminal defense lawyers must follow if they are to escape being later deemed ineffective. It would also be a new rule, for while many cases hold that defense counsel need not (depending on the circumstances) present any mitigation evidence at all, e.g., *Preston v. Delo*, 100 F.3d 596, 603 (8th Cir.1996); *Marek v. Singletary*, 62 F.3d 1295, 1300 (11th Cir.1995); *Porter v. Singletary, supra*, 14 F.3d at 557, we cannot find any case that holds that counsel must follow a particular line in investigating the possibilities for obtaining such evidence. The usual view is that an assessment of ineffective assistance of counsel depends, barring extreme cases, on the particular circumstances of the case. E.g., *Payne v. United States*, 78 F.3d 343, 348 (8th Cir.1996). We are not supposed to grant relief in a habeas corpus proceeding on the basis of a new rule. *Teague v. Lane*, 489 U.S. 288, 109 S.Ct. 1060, 103 L.Ed.2d 334 (1989); *Gacy v. Page*, 24 F.3d 887 (7th Cir. 1994); *Curtis v. Duval*, 124 F.3d 1, 4–5 (1st Cir.1997); *Miller v. Lockhart*, 65 F.3d 676, 685 (8th Cir.1995). The state does not argue *Teague*, but this is excusable neglect, because Thomas denies wanting a new rule, though that is one construal of his submission. Anyway a court can invoke *Teague* even if the state has waived it. *Caspari v. Bohlen*, 510 U.S. 383, 389, 114 S.Ct. 948, 952–53, 127 L.Ed.2d 236 (1994); *Eaglin v. Welborn*, 57 F.3d 496, 499 (7th Cir.1995) (en banc); *Curtis v. Duval, supra*, 124 F.3d at 5.

So Thomas cannot prevail by asking for a rule requiring the subpoenaing of institutional records in all capital cases; but that leaves open the possibility that his lawyer failed to come up to minimum professional standards by not subpoenaing the records in the particular circumstances of *this* case. Even if she did fail to come up to the minimum—and a strong argument can be made that, given the absence of other good mitigating evidence, a reasonable lawyer in her position would indeed have subpoenaed the institutional records—Thomas has not succeeded in proving that he was prejudiced by the lawyer's failure. The right to *effective* assistance of counsel presupposes that if counsel had been competent, it would have made, to some substantial likelihood, a difference in the outcome. Therefore "the defendant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *Strickland v. Washington, supra*, 466 U.S. at 694, 104 S.Ct. at 2068. See also *Liegakos v. Cooke*, 106 F.3d 1381, 1387 (7th Cir.1997); *David v. United States*, 134 F.3d 470, 477–78 (1st Cir.1998). Counsel cannot confidently be deemed ineffectual if it is unlikely that a better performance would actually have helped his client.

This is such a case. To begin with, the two possible strategies, the "nice guy" strategy that failed and the "psycho" strategy which Thomas's current counsel tells us any competent lawyer would have preferred, could not have been combined; it was either/or. At argument Thomas's current lawyer, equating "schizoid" to having a split personality—when what the term actually means is having difficulty expressing emotions and forming relationships, American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders* 301.20, p. 638 (4th ed.1994)—suggested that the two strategies could have been combined in a theory that Thomas was nice most of the time but went crazy under particular stimuli. This argument is neither made in Thomas's brief nor supported by the psychiatric evidence obtained after the sentencing hearing.

All that the extensive research of the postconviction counsel and mitigation expert turned up was that Thomas was of dull normal intelligence, that his mother may have beaten him when he was growing up and fought with his alcoholic father, that he is

suspicious ("mildly paranoid"), that he has difficulty relating to other people ("schizoid tendencies"), and that he may have some brain damage, though not enough to push him below the average level of intelligence. This is unimpressive evidence in comparison with the evidence in cases in which the failure to obtain psychological evidence for presentation at the sentencing hearing was the basis for ordering a new hearing. *Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir.1996); *Brewer v. Aiken*, 935 F.2d 850, 858–59 (7th Cir.1991); *Bloom v. Calderon*, 132 F.3d 1267, 1273–77 (9th Cir.1997); *Clabourne v. Lewis*, 64 F.3d 1373, 1385–86 (9th Cir.1995); *Antwine v. Delo*, 54 F.3d 1357, 1365–68 (8th Cir.1995); *Baxter v. Thomas*, 45 F.3d 1501, 1512 and n. 30 (11th Cir.1995); *Hendricks v. Calderon*, 864 F.Supp. 929, 933–35 (N.D.Cal. 1994), aff'd, 70 F.3d 1032, 1044–45 (9th Cir. 1995). It is actually weaker than evidence in cases in which courts have upheld the denial of such relief. *Eddmonds v. Peters*, 93 F.3d 1307, 1319–22 (7th Cir.1996); *Green v. Johnson*, 116 F.3d 1115, 1123 (5th Cir.1997). And, as in those cases, mixed in with the psychological evidence in mitigation is evidence that, had a mitigation defense based on psychological evidence been attempted, would have been used by the prosecutor as further evidence in aggravation. *Eddmonds v. Peters, supra*, 93 F.3d 1307, 1321; *Green v. Johnson, supra*, 116 F.3d at 1123. This included evidence that Thomas was belligerent and hostile, and had been so in the classroom; that he had poor impulse control; that he is "quite intelligent" and his speech is "fluent and grammatical"; that when irritated and frustrated he could "act out in explosive ways"; that one judge had said that "it would be dangerous to allow this person to walk the street"; that a clinical evaluation had said that "in his present condition, [Thomas] must be regarded as quite dangerous, specifically from a sexual point of view." This evidence in aggravation, secreted as it were in the interstices of the psychological defense, further demonstrates the impossibility of combining that defense with a "nice guy" defense. One of the documents unearthed by the postconviction investigation, incidentally, is a social worker's report confirming "the relative stability of the home situation." Another such report states, "this appears to be a good family unit."

Even viewed in isolation, the mitigation evidence was unimpressive. The principal document is the report of a psychiatrist who examined Thomas on death row. The report attributes the murder to "an unfortunate synchronicity of events," Thomas having been "in the process of leaving the victim's garage when she screamed and tried to restrain him from behind. Mr. Thomas was conditioned to act reflexively in such a circumstance." The only evidence that the murder victim screamed and tried to "restrain" Thomas, or that he was already in the process of leaving the garage when she surprised him, came from Thomas's confession. The psychiatrist's uncritical dependence on the murderer's uncorroborated self-exculpatory statement, along with the psychiatrist's effort to blame Thomas's behavior on an "oedipal situation," would have exposed the psychiatrist to lacerating cross-examination had he testified at the sentencing hearing.

Men who repeatedly assault women, finally murdering one, are unlikely to have a normal psychological profile. Cf. *Kokoraleis v. Gilmore, supra*, 131 F.3d at 697. They are unlikely to be the highly intelligent products of a warm and loving home. It is difficult to believe that a jury otherwise minded to sentence Thomas to death would have been moved by the evidence, evaluated as a whole, which his current lawyers not unreasonably fault his trial lawyer for having failed to uncover. Even if she had dug up all this evidence, she might reasonably have decided that on balance it was better to keep it away from the jury and instead stake her all on convincing the jury (or at least one member of the jury, all that it takes in Illinois to prevent the imposition of the death penalty, *People v. Ramey*, 152 Ill.2d 41, 178 Ill.Dec. 19, 36, 604 N.E.2d 275, 292 (1992)) that Thomas was a generally decent person who yielded at times to an irresistible impulse to violence; that he had some redeeming qualities; and that it would be unfair to sentence a man to death when the police had extracted a confession from him by promising his mother that if he confessed he would not be executed. The fact that in the end a compe-

tent lawyer might have decided to do just what Thomas's lawyer did, fearing that psychological evidence would simply have made her client look weird and dangerous, suggests that her failure to investigate was harmless. But more plainly it shows that Thomas has failed to establish a substantial likelihood that had his trial lawyer conducted the same thorough investigation that his postconviction counsel conducted Thomas would have been spared.

This is not to say that his trial lawyer in fact chose the better defense. By trying to portray Thomas as a "nice guy," she opened herself to the withering scorn of the prosecutor, who in rebuttal to the closing argument of Thomas's lawyer remarked, "He never rapes his family. He never attacks his friends. And he is a nice guy. He is nice enough to leave his neighborhood and go to other people's neighborhoods to terrorize them." He added, "There is no evidence that Walter came from a bad home environment. In fact, the evidence is the opposite. There is no evidence that he had any psychological problems." But the prosecutor's main emphasis was on Walter's being cruel and pitiless, devoid of rehabilitative potential, remorseless, sadistic; and he could thus have used the psychological evidence that Thomas's lawyer did not present to as good purpose as he used the "nice guy" evidence. (Toward the end of his rebuttal, he said, "Walter Thomas is every woman's nightmare"—a theme to which the psychological evidence would have added resonance.) Indeed, it is predictable that if Thomas's lawyer had taken the path that his current lawyer says she should have taken, we would now be faced with the argument that the lawyer made the wrong choice—that the psychological evidence was too thin to be worth putting before the jury—and that therefore a new sentencing hearing should be ordered.

His best case is *Emerson v. Gramley, supra,* where we held that the failure to investigate the defendant's history, in a case in which no mitigation evidence at all was introduced at the sentencing hearing, entitled him to a new hearing. Emerson's history, however, was garish and shocking, including his being shot and seriously wounded at the age of eight and the death of his child possibly strangled by her mother; we referred to "a life that one juror in twelve might find so bleak, so deprived, so harrowing, so full of horrors ... as to reduce Emerson's moral responsibility" for the murder. 91 F.3d at 907. There is nothing comparable here. Thomas's history is that of a sociopath-a compulsive, and eventually a homicidal, criminal. Moreover, because in *Emerson* there was no alternative theory of mitigation, it was not possible there as it is here to conclude that while the alternative approach that was taken may not have been very good, it may have been as good as the psychohistory approach that was not taken.

■ His only other argument for reversal is that the prosecutor, in his opening argument at the sentencing hearing, appealed to racial prejudice and by doing so fatally tainted the hearing and the resulting sentence. The prosecutor remarked in passing that a detective would testify that one or both of Thomas's prior sexual offenses involved "young white women and both of those cases involved knives." Thomas's counsel did not object to the remark, and the Supreme Court of Illinois therefore considered the issue waived; and though it added that there was no plain error, *People v. Thomas, supra,* 148 Ill.Dec. at 769, 561 N.E.2d at 75, review for plain error does not cure a procedural default. *Neal v. Gramley,* 99 F.3d 841, 843–44 (7th Cir.1996).

This may not seem, and in other cases might not be, an entirely satisfactory resolution, since if the prosecutor was appealing to racial prejudice an objection would only have magnified the appeal. But in context it appears that the only purpose of the remark was to establish that Thomas was following a pattern in his assaultive behavior; and his lawyer testified later that she had not objected because she had not considered it an appeal to racial prejudice. The prosecution did not elsewhere suggest a possible racial motive for Thomas's crimes; the remark was too fleeting and isolated to have planted such a suggestion in the jury's mind; and the detective never did testify about the race of any of Thomas's victims. The remark did not prevent Thomas from having a fair trial,

and so it did not deny him due process of law. *Donnelly v. DeChristoforo*, 416 U.S. 637, 642–43, 94 S.Ct. 1868, 1871–72, 40 L.Ed.2d 431 (1974).

No error of constitutional magnitude was committed in the sentencing hearing. The judgment of the district court is therefore

Affirmed.

RIPPLE, Circuit Judge, dissenting.

Mr. Thomas' troubles with the law began when he was fourteen years old.[1] In February 1969, Mr. Thomas attacked a female teacher at the school he was attending. In that attack, Mr. Thomas accosted that teacher with a knife, and, while holding the knife to her throat, attempted to lead her down the hall. Several months later, Mr. Thomas attacked another female teacher. During that attack, Mr. Thomas twice struck the teacher in the face with a table leg. For these two offenses, Mr. Thomas was adjudicated a delinquent minor and received six months probation. During that probation, Mr. Thomas was examined by the Clinical Division of the Juvenile Court. The individual conducting the examination[2] concluded that Mr. Thomas could be "explosive" at times and had "poor impulse control." He further noted that Mr. Thomas had a tendency to "act out in explosive ways" when "irritated and frustrated." The examiner concluded that Mr. Thomas was an individual of "limited intelligence" who "is unable to handle new stresses and concepts and does not always tolerate authorities very well." This examiner, however, did not believe that Mr. Thomas was in need of any psychiatric care and concluded that there was no "thinking disorder."

It was not long before Mr. Thomas was back in juvenile court. On the morning of October 29, 1970, he attacked a nurse as she arrived for work at Mount Sinai Hospital. Lying in wait in the hospital parking lot, Mr. Thomas accosted the nurse, placed a knife to her throat, grabbed her by the wrists and led her to a nearby park. At that point, something frightened Mr. Thomas; he released the victim and fled the scene.

The pattern continued. A few months later, Mr. Thomas attacked another nurse in the parking lot of that same hospital. On that occasion, Mr. Thomas, wielding a knife, ordered the nurse into her car, told her to take off her clothes, and stole her purse. Again, Mr. Thomas was apparently scared off before he had the opportunity to assault sexually his victim. For these two crimes, Mr. Thomas was adjudicated a delinquent ward of the court and was committed to the Department of Corrections, Juvenile Division, for fifteen months. During that time, Mr. Thomas underwent numerous psychological examinations and was treated with at least six months of one-on-one psychotherapy. Mr. Thomas' juvenile records contain ample evidence of these examinations and treatments and indicate a serious concern with Mr. Thomas' mental health.

On February 19, 1971, an initial examination was conducted by a psychologist associated with the Cook County Juvenile Court. The psychologist reported that Mr. Thomas had an IQ of 82, placing him at the "low end of the dull normal range of intelligence." The psychologist also concluded that Mr. Thomas exhibited elements of a "schizoid personality." He further noted that Mr. Thomas exhibited signs of "conflict with the opposite sex" and felt threatened by female authority figures. Finally, the psychologist recommended counseling and warned that Mr. Thomas should be placed under "strict controls and supervision" in order to prevent his involvement in further wrongdoing.

1. For the most part, the information contained in the following discussion has been taken from the psychiatric reports contained in Mr. Thomas' juvenile records and the deposition of Mr. Thomas' trial defense counsel which was taken in connection with the state post-conviction proceeding. The psychiatric reports can be found in volume one of the record of the state post-conviction proceeding at tabs 10–24; the deposition can be found at tab 1 in the same volume. In addition, some information in the following discussion was taken from the transcript of Mr. Thomas' sentencing hearing which is found in the state court trial record, transcript volume numbers 44–46.

2. The name and title of the individual conducting this investigation had been redacted from the report found in the record. Accordingly, we do not know the professional background of the individual whose findings are contained in that report.

After reviewing this report, the juvenile court concluded that it was "dangerous to allow [Mr. Thomas] to walk the street." Accordingly, the court decided that it had "no alternative but to recommend commitment with the understanding that this boy's problems are deeply rooted and of an emotional nature." In addition, the court recommended that Mr. Thomas be placed at the Tinley Park Mental Health Clinic rather than a punitive institution. The court further stated that, if such a placement was not possible, psychotherapy should be available wherever Mr. Thomas was placed. In April 1971, Mr. Thomas was placed in the Illinois State Training School for Boys ("Training School").

Prior to placement in the Training School, Mr. Thomas was evaluated by both a psychiatrist and a psychologist. The psychiatrist concluded that Mr. Thomas suffered from "no overt psychosis" but noted that he exhibited "mildly paranoid propensities." In addition, the psychiatrist recommended that Mr. Thomas be given an electroencephalogram ("EEG") to ascertain if he had suffered brain damage as a result of a long bout with scarlet fever as a youth. The psychologist diagnosed Mr. Thomas as "an emotionally disturbed youth" and concluded that his attacks were "a continuation of his feeling threatened by females" and attempts "to increase his sense of masculinity." The psychologist recommended that Mr. Thomas be involved in "intensive one-to-one psychotherapy" and that he be "psychiatrically examined prior to release to assess the degree of threat he poses for females and himself and to assess his mildly paranoid propensities."

A few months after his placement at the Training School, Mr. Thomas was evaluated by another psychiatrist. In his report, the psychiatrist stated that his examination of Mr. Thomas revealed "a strong suggestion of organicity, plus a severe degree of emotional psychopathology." He strongly suspected that Mr. Thomas suffered from organic brain damage and ordered that an EEG be done on Mr. Thomas. The doctor stressed that, with or without the organic damage, Mr.

Thomas suffered from a "very real and serious psychological problem." In light of this problem, the doctor warned that Mr. Thomas "must be regarded as quite dangerous, particularly from a sexual point of view." The doctor concluded that Mr. Thomas should receive six months of psychotherapy.

Shortly after this examination, Mr. Thomas began the prescribed regime of psychotherapy. Mr. Thomas' treatment consisted of weekly meetings with a psychologist. In addition, an EEG examination was conducted during that time. The results of Mr. Thomas' EEG were "borderline abnormal." Although the EEG itself was not strong evidence of organic brain damage on its own, the electroencephalographer noted that the EEG "could be supportive of a clinical opinion of epilepsy" in the event that the clinical record also supported that conclusion. He recommended that Mr. Thomas return for a repeat EEG in six months and that he be subject to additional clinical observation in the meantime.

At the conclusion of the six months of psychotherapy, Mr. Thomas' treating psychologist reported that Mr. Thomas had made significant progress during the six-month regime. Although Mr. Thomas began the regime with a hostile disposition, his therapist noted that the hostility had subsided over time and that Mr. Thomas had improved his relationships with his peers. The therapist also reported that Mr. Thomas' behavior at the institution had improved and that he had shown significant interest in his welding classes. At that time, Mr. Thomas was re-evaluated by the same psychiatrist who examined him shortly after his placement in the Training School. The psychiatrist noted that Mr. Thomas had made significant progress in his therapy but cautioned that Mr. Thomas' progress "should by no means be interpreted as an indication that Walter is out of the woods from a psychopathological point of view." In addition, the doctor noted the inconclusive EEG results and restated his strong suspicion that Mr. Thomas suffered from some degree of organic brain damage.[3]

---

3. With regard to the possibility of organic brain damage, the psychiatrist stated:

The question of his organicity is still unresolved and, of course, the electroencephalo-

Nonetheless, in light of the progress Mr. Thomas had made, the psychiatrist recommended that Mr. Thomas be transferred to an out-patient setting on the condition that arrangements be made for continuing treatment by a psychiatrist or psychologist and that there be regular and repeated follow ups to ensure that such treatment was indeed taking place. The doctor also recommended that a second EEG be done on Mr. Thomas during the course of the out-patient therapy. Accordingly, Mr. Thomas was placed on parole and released to the custody of his parents in April 1972. Department of Corrections records indicate that arrangements were made for Mr. Thomas to receive continuing psychotherapy at the Englewood Mental Health Center.

About one year later, Mr. Thomas reverted to his old ways and the pattern of his earlier assaultive behavior toward females resumed. In June 1973, Mr. Thomas followed a nurse leaving work at the University of Illinois Medical Center ("Medical Center") and accosted her with a knife as she was getting into her car. This attack took place in the middle of the afternoon only a few blocks away from the Medical Center. After threatening to kill the nurse, Mr. Thomas ripped off her clothes and raped her. Moments later, Mr. Thomas forced the victim to perform oral sex. He then instructed the victim to drive the car to a more secluded area where he raped her again. He kept her in the car for another hour and a half. During that time, he told the victim that he would have to kill her because the last nurse he raped identified him and caused him to go to prison. She implored him to spare her life and promised that she would not turn him in. He then drove to the parking lot of a Sears store and raped her one more time. Finally, after instructing the victim to drive to a certain location, Mr. Thomas took her wallet and driver's license (so he would know where she lived), exited her vehicle and fled the scene.

The pattern continued. A few weeks later, Mr. Thomas attacked a female medical student who was leaving the Medical Center in mid-afternoon. Mr. Thomas grabbed the student as she entered her car, which was parked on a side street near the Medical Center. He put a knife to her throat and ordered her to get in the car and to move over to the passenger's seat. After rummaging through the student's purse, Mr. Thomas unbuttoned her pants and looked down her shirt. After remarking that the student's car was too small, Mr. Thomas switched seats with the victim and ordered her to drive to a secluded area. After turning onto a busy road, the victim deliberately bumped into the car in front of her. When the driver turned around, the victim began to waive her arms and scream. After attempting to stab the victim, Mr. Thomas fled the scene.

The pattern again continued. On July 6, 1973, a University of Illinois Security Officer observed Mr. Thomas following women near the Medical Center. Each time his patrol car drove by, Mr. Thomas would do "a 180" and walk the other way. This scenario played itself out about ten times over an hour and a half. The officer then placed Mr. Thomas under arrest for the attacks on the two women. Both victims later identified him as their attacker. Mr. Thomas was charged with armed robbery, deviate sexual assault and rape for the first attack and was charged with attempted rape and attempted armed robbery for the second. He pleaded guilty to all charges against him and was sentenced to concurrent sentences of four to eight years. Mr. Thomas was paroled on February 23, 1978.

The foregoing narrative of Mr. Thomas' propensity to attack females evidences either a very depraved individual or a very disturbed one. In making the life or death judgment as to whether Mr. Thomas falls, by virtue of his conduct, into that small group of

gram is very interesting since it is exactly in line with the clinical picture, vis-a-vis, it is recorded as being borderline and the possibility of an epileptic disorder cannot be ruled out. We are thus faced with the peculiar picture of a clinician stating that this could be organic depending on the electroencephalogram and the electroencephalographer saying this could be organic depending on the clinician. This leaves us right where we were and we still have to say that there is a suspicion of brain damage here. Certainly, the lack of insight that Walter displays is characteristic of this kind of condition.

criminals for which Illinois reserves the death penalty, *see* 720 ILCS 5/9–1, it was important that the jury know not only that he had such a conduct history, but that he also had such a clinical history. The jury was deprived of that information because the trial defense counsel did not uncover it. In my view, this failure constituted substandard representation. I believe that a competent attorney representing a defendant in a criminal case of this nature would make a point of familiarizing herself thoroughly with the client's criminal history. Once apprised of that criminal history, a reasonably competent attorney would also recognize the strong possibility that it might be accompanied, as it was, with a significant psychiatric dimension. Furthermore, given the options presented by this record, there was no real choice but to disclose that information to the jury.

I agree with the majority that, in a situation in which there is no reason to doubt the ability of the defendant or of his family to render assistance, it makes good sense for counsel to rely upon their accounts of the defendant's past. Indeed, *Strickland* specifically contemplates such reliance. *See Strickland v. Washington*, 466 U.S. 668, 691, 104 S.Ct. 2052, 2066–67, 80 L.Ed.2d 674 (1984). *Strickland's* approval of such a general approach does not, however, permit counsel to suspend professional judgment. In this case, given the nature of the defendant's criminal history, counsel had an obligation to investigate aggressively the causes for such a life-pattern and then to assess whether the results of that search might indeed lead a jury to decide that, given the defendant's psychiatric history, his moral responsibility for the crime required a punishment other than death. The criminal history evidenced here would alert a competent defense lawyer to the distinct possibility that the defendant had a psychiatric history that might convince a member of the jury to decide that, however heinous the present crime and the criminal history, the defendant's diminished capacity for moral responsibility makes imposition of the death penalty unwarranted.

The majority evades this crucial issue by focusing on its concern that holding Mr. Thomas' lawyer to such a standard of performance would establish a per se rule that counsel must make a comprehensive investigation of a defendant's background in every capital case in which the defendant has a history of having committed sex-related crimes. The majority answers, correctly, its own fears by noting that it is firmly established that each case must be assessed on its own merits. As the rendition above makes clear, and as the majority admits, this case involves a recidivist sexual predator whose behavior, both in its severity and frequency, ought to have alerted counsel to the possibility of psychiatric information of importance at a capital sentencing hearing. Under the circumstances presented here, the investigation conducted by defense counsel simply was far below the level of performance that one would expect. Indeed, the majority admits as much. *See ante* at 515–516.

Having admitted that a good case can be made that counsel's performance was not up to par, the majority nevertheless sends Mr. Thomas to his death because it believes that there is no substantial possibility that a competent investigation and submission to the jury would have made a difference. It reaches that result first by deciding—on its own—that the two defenses—"the nice guy" and the "psycho"—could not be combined. This conclusion is not self-evident. Criminal behavior, especially deviant criminal behavior such as exhibited here, does not always pervade all of a person's life and all of a person's relationships. Indeed, the contrast between the Mr. Thomas' life at home and his life on the street might have emphasized to a member of a jury that the defendant's psychiatric condition was hardly within the normal range.[4]

4. The majority contends that, in the event that trial counsel had discovered the psychological evidence, she could not have swayed the jury by presenting the "theory that Thomas was nice most of the time but went crazy under certain stimuli." *Ante* at 516. Yet, the majority later concludes that, under the same circumstances, it may have been reasonable for counsel to put the psychological evidence on the shelf and to "stake her all on convincing the jury ... that Thomas was a generally decent person who yielded at times to an irresistible impulse to violence." *Ante* at 517. In my view, these two theories are substantially similar. In fact, a jury might have

The majority then engages in its own assessment of the worth of the psychiatric evidence and notes the obvious risk that it might not be accepted by many jurors. Two considerations militate against giving the possibility of nonacceptance by some jury members controlling effect.

First, in order to show prejudice, Mr. Thomas must show that "there is a reasonable probability that, but for counsel's unprofessional errors, the results of the proceeding would have been different." *Strickland*, 466 U.S. at 694, 104 S.Ct. at 2068. Under Illinois law, a defendant cannot receive the death sentence if one juror objects to the imposition of that sentence. *See* 720 ILCS 5/9–1(g). Thus, in this case, Mr. Thomas need only show that there is a reasonable probability that, but for counsel's unprofessional errors, one juror would have voted against the death penalty. In short, if one juror believed that Mr. Thomas' psychiatric background made the death penalty unacceptable,

that penalty would not have been imposed. *See Emerson v. Gramley*, 91 F.3d 898, 907 (7th Cir.1996) (evidence of petitioner's dull, normal IQ, psychological problems and consistent antisocial behavior may have convinced at least one juror to vote against the imposition of the death sentence), *cert. denied*, —— U.S. ——, 117 S.Ct. 1289, 137 L.Ed.2d 364 (1997); *Brewer v. Aiken*, 935 F.2d 850, 857–58 (7th Cir.1991) (petitioner prejudiced by counsel's failure to present evidence of low IQ, brain damage, lack of self control, susceptibility to influence of others and disadvantaged background).

Second, as the majority also admits, the possibility of such a rejection must be weighed against the alternate defenses available to Mr. Thomas. The "nice guy" defense found adequate by the panel majority is, in essence, no defense at all.[5] Its weakness was emphasized by the State's case in aggravation which focused on the horrible nature of Mr. Thomas' earlier crimes—an account

found the first theory, when presented with the copious psychological evidence summarized above, more persuasive than the second.

Indeed, trial counsel's chosen "nice guy" strategy faltered in large part because it did not provide the jury with an explanation of Mr. Thomas' aberrant behavior. This omission made it easy for the jury to dismiss the "nice guy" defense as irrelevant and to view Mr. Thomas as a depraved criminal who, in the State's words, was "nice enough to leave his neighborhood and go to other people's neighborhoods to terrorize them." In fact, the "nice guy" strategy was so easy to dismiss, it amounted to no defense at all. By contrast, a strategy combining evidence of Mr. Thomas' "good side" with the evidence of his psychological problems would have presented the jury with a more coherent and logical picture of a psychologically disturbed individual who may have been able to function normally in some aspects of life, but was nonetheless subject to bouts of aberrant behavior under certain stimuli. The psychological evidence in Mr. Thomas' juvenile records supports this theory—Mr. Thomas was diagnosed as an individual with a "schizoid tendency" who had "poor impulse control" and was prone to "act out explosive ways." Mr. Thomas' records also reveal that he was diagnosed as having a "very real and serious psychological problem" and that at least one of his psychologists felt there was a strong possibility that Mr. Thomas suffered some organic brain damage as the result of a childhood illness. For example, this ample psychological evidence would have given an entirely different context to the statement of Mr. Thomas' former girlfriend

that the Walter Thomas she knew could not have committed the murder or the other crimes. There is a reasonable probability that this strategy would have convinced at least one juror that Mr. Thomas' diminished capacity for moral responsibility required a punishment other than death.

5. In addition to the testimony of Mr. Thomas' mother that she had urged her son to confess because a police officer had assured her that he could obtain a favorable disposition, counsel offered the following testimony. The first witness was a cousin of Mr. Thomas whom counsel discovered the morning of the mitigation phase when she accompanied Mr. Thomas' mother to court. This witness admitted that she was not very close to Mr. Thomas, but knew him "quite well." Her testimony was limited to an account of Mr. Thomas doing various jobs around the church. The second witness, Noreen Wallace, a landlord of Mr. Thomas' family, testified that she had known him for the last ten years and that he had performed odd jobs for her and helped at neighborhood gatherings. On cross-examination, she admitted, however, that, for a substantial period of time, Mr. Thomas had not lived with the family. A former apartment mate testified that he had shared an apartment with Mr. Thomas, but admitted that he was unaware of his criminal record. A former live-in girlfriend testified that the individual that she knew could not have committed the crimes of which he stood convicted. Counsel prepared all these mitigation witnesses in a group session on the morning of their testimony.

that, unlike the account set forth above, made no mention of Mr. Thomas' psychiatric condition.[6] In fact, in its closing argument, the State emphasized the fact that there was no evidence in the record indicating that Mr. Thomas suffered from any psychological problems.

It is, of course, well established that we shall not second-guess the tactical choices of counsel. See *Strickland*, 466 U.S. at 689, 104 S.Ct. at 2065 ("Judicial scrutiny of counsel's performance must be highly deferential."). Nonetheless, those choices must be reasonable ones. Here, it simply was unreasonable for counsel to let go unanswered the State's account of Mr. Thomas' criminal past and to rely exclusively on the so-called nice guy defense.

Because I believe that Mr. Thomas was denied the right to effective assistance of counsel as guaranteed by the Sixth Amendment, I would reverse the judgment of the district court.

---

**6.** The State began its aggravation case with the testimony of the nurse whom Mr. Thomas brutally raped on June 8, 1973. The nurse described her encounter with Mr. Thomas in graphic detail. The State then presented testimony from Officer Donald Foster, the University of Illinois Security Officer who arrested Mr. Thomas for the June 1973 attacks after observing him following women outside the University of Illinois Medical Center. The State then shifted gears momentarily and presented the testimony of a resident of a condominium complex where Mr. Thomas had performed janitorial work. This individual testified that he once discovered Mr. Thomas snooping in his garage. Returning to the June 1973 attacks, the State then presented the testimony of Detective Michael Shull of the Chicago Police Department who had participated in the investigation of the June 1973 attacks. The State followed Detective Shull's testimony with the testimony of two members of the Aurora Police Department who were involved in the investigation of the murder of Darlene Dudek, the crime at issue in this case. The second officer, Detective Lawrence Langston, told the jury that, when he questioned Mr. Thomas about

the June 1973 attacks, Mr. Thomas told him that "he really didn't care about the victims at the time," that those crimes "were more or less of a joke," and that he was "trying to prove his manhood to his friends." The State then presented the testimony of two employees of the Illinois Department of Corrections. First, Dennis Jennings, a Correctional Sociologist, described an interview with Mr. Thomas after his conviction for the June 1973 attacks. Mr. Jennings testified that Mr. Thomas denied responsibility for the June 1973 attacks and claimed that he was taking the fall for some friends. The second witness, Robert Caldwell, an employee of the Department of Corrections Microfilm Division, read from records containing a description of Mr. Thomas' prior crimes including his juvenile offenses. Coming full circle, the State then presented the testimony of the medical student whom Mr. Thomas attempted to rape on June 22, 1973. The former student, who had become a doctor, provided vivid testimony concerning her encounter with Mr. Thomas. Finally, the State closed its aggravation case by offering into evidence certified copies of Mr. Thomas' juvenile and adult convictions.