**UNITED STATES of America, Appellee,**

v.

**Christian CASTRO, Defendant, Appellant.**

No. 97–1684.

United States Court of Appeals,
First Circuit.

Submitted Nov. 5, 1997.

Decided Nov. 18, 1997.

Dana A. Curhan, Boston, MA, on brief, for appellant.

Jay P. McCloskey, United States Attorney, Bangor, ME, Margaret D. McGaughey and George T. Dilworth, Assistant United States Attorneys, Portland, ME, on brief, for appellee.

Before SELYA, Circuit Judge, COFFIN, Senior Circuit Judge, and STAHL, Circuit Judge.

SELYA, Circuit Judge.

In this criminal appeal, defendant-appellant Christian Castro argues that the district court erred when it excluded the testimony of two prospective defense witnesses on the ground that each of them, if called to the witness stand, could and would invoke his Fifth Amendment privilege against self-incrimination. In addition, Castro asseverates that the prosecution's role in keeping one of these witnesses from testifying distorted the factfinding process and denied him a fair trial. Discerning no error, we affirm the judgment of conviction.

## I.

### Background

A federal grand jury indicted the appellant on a charge of conspiring to possess cocaine base (crack cocaine) with intent to distribute. *See* 21 U.S.C. §§ 841(a)(1) & (b)(1)(B), 846. The charge arose out of the appellant's supposed involvement in a multi-faceted drug trafficking ring. The evidence at trial, viewed in the light most favorable to the government, *see United States v. Maraj*, 947 F.2d 520, 522 (1st Cir.1991), showed that the conspiracy flourished in mid–1994. The appellant's role was to deliver crack cocaine between Lawrence, Massachusetts and Lewiston, Maine. Upon arriving in Lewiston, the appellant would stay at one of several dwellings in which other coconspirators resided and would supervise the ensuing "retail" sales. The coconspirators were geographically dispersed and communicated largely by telephone. Many of the telephone numbers that they used were listed under false names.

At trial, the government presented a very strong case against the appellant. Among other things, several self-styled members of the conspiracy testified for the prosecution and inculpated the appellant. Faced with this array of turncoat witnesses, the appellant sought to call his brother, Manuel Enrique "Ricky" Castro, and a previously convicted coconspirator, Melvin "Bubba" Lagasse, as defense witnesses. Both men informed the district court that they intended to invoke the Fifth Amendment privilege against self-incrimination.

After the government rested, the court convened a voir dire hearing out of the presence of the jury. The court prudently required the parties to proceed in a question-and-answer format. Each witness was represented by an attorney. Defense counsel's questions to Ricky Castro focused on Ricky's knowledge anent (1) the appellant's relationship to numerous addresses, and his involvement with a particular dwelling (which the government contended was a "crack house"), and (2) various telephone numbers that other witnesses had said they used in the course of the conspiracy.

Ricky Castro invoked his Fifth Amendment privilege against self-incrimination and refused to testify concerning these matters. Defense counsel objected and asked the district court to compel responsive answers. Counsel argued that Ricky Castro's testimony would help establish salient points (e.g., that the appellant did not reside at the specified addresses; that he allowed friends to install a telephone under his name which he, himself, did not use; and that he had a different telephone number—not associated with the felonious activities—which he did use) without in any way incriminating the witness. Ricky's lawyer took a different view.

The trial judge upheld the claim of privilege. He found, first, that the requested information might tend to incriminate the witness, and second, that the government's cross-examination would likely delve into the scope and degree of the witness's knowledge of his brother's activities and could thus lead to inculpatory information.[1]

From Lagasse, defense counsel attempted to elicit a statement that the appellant was not involved in the drug trafficking operation. Counsel also sought to ask Lagasse

---

1. In this regard, Judge Hornby stated:
 Certainly, there are plenty of innocent explanations why somebody might know the residence of a family member, but by the same token, if you don't know their residence, that might afford you a defense under certain criminal charges. And I take it, [counsel's] argument therefore is by admitting to knowledge, he has thereby lost that potential defense of lack of knowledge concerning the circumstances.

about divers coconspirators' reputations for truthfulness. Lagasse invoked his Fifth Amendment privilege as to these questions. The district court rebuffed the appellant's argument that Lagasse did not face any real threat of incrimination because he already had been convicted on the conspiracy charge, finding that Lagasse had valid Fifth Amendment concerns in two respects: (1) his exposure to prosecution for one or more robberies which may have occurred in the same time frame as, and in relation to, the drug conspiracy, and (2) his exposure to prosecution for substantive drug offenses committed during and in the course of the conspiracy.

The trial concluded without testimony from either Ricky Castro or Bubba Lagasse. The jury found the appellant guilty as charged and Judge Hornby imposed sentence. This appeal followed.

## II.

### Discussion

### A.

### Standard of Review

█ In challenging the district court's determination that these witnesses invoked the Fifth Amendment privilege appropriately and in good faith, the appellant invites us to subject that determination to plenary review. We decline the invitation. The proper standard for appellate review of a trial court's determination that a witness validly invoked his Fifth Amendment privilege is abuse of discretion. *See United States v. Gary,* 74 F.3d 304, 310 (1st Cir.1996); *United States v. Pratt,* 913 F.2d 982, 990 (1st Cir.1990); *see also Hoffman v. United States,* 341 U.S. 479, 488, 71 S.Ct. 814, 819, 95 L.Ed. 1118 (1951) (explaining that the court of appeals should reverse such a determination only when it is "perfectly clear from a careful consideration of all the circumstances in the case" that the witness's testimony "cannot possibly have such tendency to incriminate").

█ Of course, abuse of discretion itself breaks down into different components. Within it, factual findings are often subjected to clear-error review, *see, e.g., United States v. Perry,* 116 F.3d 952, 957 (1st Cir.1997),

whereas material errors of law constitute *per se* abuses of judicial discretion, *see, e.g., Koon v. United States,* — U.S. —, —, 116 S.Ct. 2035, 2047, 135 L.Ed.2d 392 (1996). Put another way, it is never within a trial court's discretion to make a determination that is premised on an incorrect legal standard.

### B.

### The Fifth Amendment

█The Fifth Amendment privilege against self-incrimination is an essential constitutional protection that is widely regarded as a cornerstone of our adversarial system of criminal justice. *See Michigan v. Tucker,* 417 U.S. 433, 439, 94 S.Ct. 2357, 2361, 41 L.Ed.2d 182 (1974). The privilege must not be given a crabbed construction. *See In Re Kave,* 760 F.2d 343, 354 (1st Cir.1985) (collecting cases).

█ Withal, the Fifth Amendment's prophylaxis is not available to all comers in all circumstances merely because they have the presence of mind to chant the accepted constitutional liturgy. To the contrary, the prospective witness must show at the very least that he is faced with some authentic danger of incrimination. *See Hoffman,* 341 U.S. at 486–87, 71 S.Ct. at 818–19; *Pratt,* 913 F.2d at 990; *In Re Brogna,* 589 F.2d 24, 27 (1st Cir.1978). This is not a particularly onerous burden. While chimerical fears will not suffice, the prospective witness need only limn some reasonable possibility that, by testifying, he may open himself to prosecution. *See In Re Kave,* 760 F.2d at 354.

█ The privilege cannot be invoked on a blanket basis. *See In re Grand Jury Matters,* 751 F.2d 13, 17 n. 4 (1st Cir.1984). It operates question by question. Thus, the district court must conduct a "particularized inquiry." *Pratt,* 913 F.2d at 990. For the privilege to attach, the questions and answers need not be directly incriminating. If a reply to a seemingly innocuous question reasonably will tend to sculpt a rung in the ladder of evidence leading to prosecution, the privilege appropriately may be invoked. *See Hoffman,* 341 U.S. at 486, 71 S.Ct. at 818;

*United States v. Johnson*, 488 F.2d 1206, 1209 (1st Cir.1973). In other words, testimony which might lead indirectly to evidence that then could be used in a future criminal prosecution is eligible for Fifth Amendment protection. *See Murphy v. Waterfront Comm'n*, 378 U.S. 52, 79, 84 S.Ct. 1594, 1609–10, 12 L.Ed.2d 678 (1964). To like effect, a court ordinarily should not permit a witness to testify on direct if the court has adequate reason to believe that the witness validly will invoke the Fifth Amendment on cross-examination with regard to matters which are bound up with those discussed on direct. *See Gary*, 74 F.3d at 309.

 In the last analysis, the nisi prius court should make a particularized finding as to the applicability *vel non* of the privilege and should elucidate its rationale. In reaching a decision as to whether a witness's testimony might tend to incriminate him, the court may of course take into consideration any personal perceptions gleaned from its observation of the prospective witness or from its hands-on involvement in the case. *See Hoffman*, 341 U.S. at 487, 71 S.Ct. at 818–19; *United States v. Zirpolo*, 704 F.2d 23, 25 (1st Cir.1983).

With this backdrop in place, we now consider the lower court's rulings in respect to each of the proffered witnesses.

### C.

#### Manuel Enrique "Ricky" Castro

, The appellant argues that his brother should have been compelled to testify because answering questions that concerned the appellant's places of residence and telephone numbers "[b]y no stretch of the imagination" would have tended to incriminate Ricky. Relatedly, the appellant posits that the trial court had the power—indeed, the duty—to preclude the government from cross-examining the witness as to other, more sensitive matters (such as the basis for the witness's knowledge). The court could have used this power, he maintains, thereby cabining the government and restricting it to a "very narrow cross."

We reject this line of reasoning. Here, the trial court proceeded with commendable cau-

tion. It prohibited the witness from invoking the Fifth Amendment on a wholesale scale. Then, in an attempt to narrow the assertion of the privilege, the court compelled the witness during the voir dire hearing to answer some preliminary questions which it deemed non-incriminating.

As to the queries involving knowledge of the appellant's addresses, the court's finding that the witness faced potential incrimination by admitting to such knowledge is fully supportable. After all, any knowledge that Ricky Castro might have had of the activities at the supposed crack house or of his brother's comings and goings at other places frequented by the coconspirators might well have furnished important clues necessary to convict Ricky, were he to be accused of participation in the drug trafficking ring. *See, e.g., In re Kave*, 760 F.2d at 354; *Johnson*, 488 F.2d at 1209; *see generally Hoffman*, 341 U.S. at 487–88, 71 S.Ct. at 818–19 (emphasizing the district court's superior ability to judge whether information would have been inculpatory in light of the "peculiarities of the case").

So, too, the court's finding anent the sundry telephone numbers: since the telephone numbers that the coconspirators used to contact each other in connection with the drug enterprise were not associated with the appellant's apparent place of residence, Ricky's knowledge of those numbers could have implicated him in the conspiracy. Requiring him to answer questions concerning the telephone number at the appellant's actual place of residence and his knowledge as to whether the appellant had ever had a telephone listing in Massachusetts would similarly have jeopardized his rights. In the idiocratic circumstances of this trial—in which evidence of telephone numbers was central to the government's case—we cannot say that the district court abused its discretion in allowing Ricky Castro to invoke his Fifth Amendment privilege.

 We give short shrift to the appellant's contention that the district court had an obligation to compel answers and then to forestall self-incrimination by severely limiting the scope of the government's inquiry on

cross-examination. We recognize, as the appellant asserts, that the Sixth Amendment assures a criminal defendant of the right to mount a defense—but that right must coexist with the government's right to test the truth of testimony proffered by the defense through the medium of cross-examination.

This is not to say that the right to cross-examination, any more than the right to present a defense, is absolute and unfettered. A trial court sometimes may avoid Fifth Amendment problems by stopping the cross-examiner from launching a fishing expedition into collateral matters. *See United States v. Berrio–Londono,* 946 F.2d 158, 161 (1st Cir. 1991); *Turner v. Fair,* 617 F.2d 7, 10 (1st Cir.1980). Still, if a jury is to hear a witness's evidence, it normally should not be told only a part of the core story. Thus, when honoring the Fifth Amendment privilege will preclude or unfairly circumscribe cross-examination as to non-collateral matters—and by "non-collateral matters" we mean matters that are both within the scope of the direct examination and of consequence to the resolution of the issues in the case—it is fully within the trial court's discretion to sustain the claim of privilege and bar the witness's testimony altogether. *See Gary,* 74 F.3d at 310; *Zirpolo,* 704 F.2d at 25–26.

■ The appellant has one more shot in his sling. He asseverates that even if the court properly excluded the testimony, it should have permitted his counsel to pose specific questions to the witness in front of the jury so that the jury could see and hear the witness claim his Fifth Amendment privilege in living color. This is whistling past the graveyard. At least in the absence of exceptional circumstances—and none are present here—trial courts should not permit witnesses who have indicated that they will refuse to answer questions on legitimate Fifth Amendment grounds to take the witness stand and assert the privilege in front of the jury. *See Namet v. United States,* 373 U.S. 179, 186, 83 S.Ct. 1151, 1154, 10 L.Ed.2d

278 (1963); *Johnson,* 488 F.2d at 1211. We fail to see any hint of discretion abused in Judge Hornby's use of standard procedure in this wise.

### D.

#### Melvin "Bubba" Lagasse

■ The appellant strives to persuade us that the district court erred in allowing Lagasse to assert his Fifth Amendment privilege because any questions posed to him either would not have incriminated him or would have been wholly peripheral to the issues before the court. We are not convinced.

The inquiry that the appellant wished to undertake vis-à-vis Lagasse was aimed at securing an admission that he (the appellant) was not involved in the drug ring.[2] Because Lagasse already had been convicted and sentenced for his participation in the same drug trafficking conspiracy, the appellant reasons that this testimony was safe in that no further possibility of self-incrimination remained. *See United States v. Pardo,* 636 F.2d 535, 543 (D.C.Cir.1980).

This reasoning is overly simplistic. It ignores the fact that, on cross-examination, the government most assuredly would have explored the extent to which Lagasse himself was involved in the conspiracy in order to test his level of familiarity with the players. Such cross-examination would have required Lagasse to testify about any and all narcotics transactions that occurred in or about the same time frame. Though Lagasse could not be prosecuted again for the conspiracy, he was not shielded from criminal liability for any substantive crimes which may have been the object of, or which were committed in the course of, that conspiracy. *See, e.g., United States v. Principe,* 482 F.2d 60, 63 (1st Cir. 1973); *Ottomano v. United States,* 468 F.2d 269, 271 (1st Cir.1972). Nor do the terms of Lagasse's plea bargain mandate a different

---

2. Here again, the district court did not permit the witness to invoke the Fifth Amendment in a blanket fashion, but required him to respond on voir dire to specific questions. Moreover, after Lagasse claimed his Fifth Amendment privilege in respect to a question, the court, if the basis for the assertion was not transparently clear, made due inquiry of Lagasse's counsel. This salutary procedure enabled the court to define the extent of the witness's legitimate Fifth Amendment interests.

result; while the plea bargain may have precluded *federal* prosecution for some of these substantive acts, Lagasse nonetheless was wide open to *state* prosecution on that account. *See United States v. Perez–Franco,* 873 F.2d 455, 460–61 (1st Cir.1989).

Of course, the appellant also wanted to ask Lagasse about his coconspirators' reputations for truthfulness. This line of questioning is subject to much the same vice. On cross-examination, the government certainly would have explored the degree to which Lagasse was involved in the drug business with the persons on whose veracity he was presuming to pass judgment. Moreover, because neither Lagasse's conviction nor his plea agreement shielded him from criminal liability for crimes of violence, the interrogation that the appellant sought to undertake would likely have gotten into at least one incident in which Lagasse allegedly had robbed a coconspirator (and for which he never had been prosecuted).

### E.

#### The Remaining Claims

The appellant's two final claims boil down to a suggestion that the government's role in keeping Lagasse from testifying distorted the factfinding process and denied the appellant a fair trial. In mounting this offensive, the appellant in effect merges two loosely related theories—the "effective defense" theory (which derives from the right to compulsory process) and the "prosecutorial misconduct" theory (which derives from the right to due process). *See United States v. Angiulo,* 897 F.2d 1169, 1190–93 (1st Cir.1990) (describing both theories). Whether viewed singly or in combination, neither theory calls the district court's rulings into doubt.

 We need not dwell on the late, unlamented effective defense theory. That theory purports to hold that if a witness can offer clearly exculpatory testimony indispensable to the defense and the government has no convincing reason to withhold immunity, the trial court may bestow use immunity on the witness. *See Government of the Virgin Islands v. Smith,* 615 F.2d 964, 974 (3d Cir. 1980). Recognizing that the power to direct

witness immunity customarily is reserved to the Executive Branch, *see* 18 U.S.C. § 6003(b), we recently interred the effective defense theory. *See Curtis v. Duval,* 124 F.3d 1, 9 (1st Cir.1997); *United States* v. *Mackey,* 117 F.3d 24, 28 (1st Cir.1997). It is not good law in this circuit and the appellant cannot profit by it.

 In contrast, the appellant's due process claim stands on sound legal footing. It is common ground that "the due process clause [constrains] the prosecutor to a certain extent in her decision to grant or not to grant immunity." *Curtis,* 124 F.3d at 10 (quoting *Angiulo,* 897 F.2d at 1191). However, this constraint operates at the margins of the prosecutor's discretion and takes on practical significance only when the prosecutor deliberately aspires to distort the factfinding process. *See id.* This type of deliberate distortion can occur in two ways: if the government attempts to intimidate or harass a potential witness, or if the prosecutor purposefully withholds use immunity to hide exculpatory evidence from the jury. *See id.; Angiulo,* 897 F.2d at 1192. Fortunately, such cases are rare—and the record does not indicate that this case is of that genre.

 In the first place, there is absolutely no evidence to validate the (entirely conclusory) assertion that the government attempted to harass or intimidate Lagasse. The mere fact that Lagasse was a federal prisoner at the time of Castro's trial does not prove the assertion. We likewise are unpersuaded by the appellant's suggestion that the prosecutor's avowed intention to cross-examine Lagasse vigorously about the alleged robbery and other non-collateral points relevant to his proffered testimony amounted to intimidation. Effective cross-examination is an essential tool that tests the reliability of a witness's testimony, and a prosecutor's stated intention to proceed down that road is no more than an acknowledgment of the obvious.

 In the same vein, the record contains no indication that the prosecutor deliberately withheld immunity from Lagasse in order to keep exculpatory testimony from the jury. In answer to the trial court's inquiry,

the prosecutor pointed out the federal government's desire not to hinder "state or federal charges of possession of controlled drugs and trafficking [that] could still be brought" against Lagasse, notwithstanding the federal conspiracy conviction. This perfectly plausible statement adequately deflects any insinuation that the government's handling of Lagasse *qua* witness was motivated by the sole purpose of keeping exculpatory evidence from the jury. *See Angiulo,* 897 F.2d at 1193.

### III.

### *Conclusion*

We need go no further. From aught that appears, the appellant was fairly tried and justly convicted. The judgment below must therefore be

*Affirmed.*