# United States Court of Appeals
## For the First Circuit

No. 22-1473

UNITED STATES OF AMERICA,

Appellee,

v.

JESUS ARLEY MUNERA-GOMEZ,

Defendant, Appellant.

APPEAL FROM THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

[Hon. Nathaniel M. Gorton, U.S. District Judge]

Before

Gelpí, Lynch, and Howard,
Circuit Judges.

David Eric Burdette, with whom Murat Erkan and Erkan &
Associates were on brief, for appellant.
Alexia R. De Vincentis, Assistant United States Attorney,
with whom Rachael S. Rollins, United States Attorney, was on brief,
for appellee.

June 7, 2023

**GELPÍ**, **Circuit Judge**.  Defendant-Appellant Jesus Arley Munera-Gomez ("Munera") appeals his conviction and subsequent sentence for attempting to possess with intent to distribute five kilograms or more of cocaine, in violation of 21 U.S.C. § 846. Specifically, Munera contends that the district court erred by declining to order the government to provide use immunity to a defense witness, resulting in a violation of Munera's due process rights; precluding Munera's girlfriend from testifying about the undue pressure placed on Munera by a confidential source, thus undermining his entrapment defense; refusing to apply safety valve relief at sentencing, despite Munera satisfying the eligibility criteria; and impermissibly considering Munera's immigration status at sentencing.  Finding his first three challenges lacking and his final argument waived, we affirm.

## I. Background

We begin by laying out the basic facts and procedural history of the case, with elaboration as needed in our analysis of the legal issues.

### A. Facts

In August 2019, a confidential source ("CS") for the U.S. Drug Enforcement Administration ("DEA") approached Munera in a Colombian billiards bar in East Boston after hearing someone

refer to him as "Pikachu."[1] CS testified that he recognized the nickname as belonging to someone who had supplied cocaine to his former business partners, Fabio and Girado Quijano. After CS introduced himself to Munera, the two interacted on several occasions at the billiards bar -- none of these conversations were recorded. During one of these interactions, CS broached the subject of doing a drug transaction with Munera, and the two agreed to meet away from the bar to discuss the details.

The first recorded meeting occurred on October 23, 2019, where CS, at the DEA's direction, arranged to meet Munera at a restaurant to discuss the drug transaction. During the meeting, Munera told his friend (who had accompanied him) that he had talked to CS before but "didn't even know who he was." During the conversation, Munera acknowledged seeing the unusual round discs of cocaine (as opposed to typical bricks) that CS had distributed in East Boston at the beginning of 2019. Munera also told CS that, at that time, he was getting twenty to thirty kilograms of cocaine from a Mexican supplier. CS informed Munera that, if they closed a deal, Munera would have to cover the transportation cost for the cocaine up front, and Munera agreed, responding, "That's the way it is. Yes."

---

[1] During his testimony, Munera acknowledged going by the nickname "Pikachu."

The next meeting between Munera and CS, which was also recorded, occurred on November 7, 2019, in a cafe. CS told Munera that he could get a few hundred kilograms of cocaine but that he did not want to "spread [him]self around" -- which he explained meant selling kilograms to multiple people, which is riskier -- and inquired what Munera thought of the risk. Munera responded, "I don't have a problem." Munera explained that his interest in the deal depended on the price because he was currently buying cocaine at "twenty-nine and a half" -- meaning $29,500 per kilogram. CS and Munera discussed pricing the cocaine at twenty-eight, meaning $28,000 per kilogram, and Munera told CS to give him eight days' notice before the cocaine arrived so that he could have $150,000 to $250,000 ready for him. When CS explained that his supplier preferred to sell 100 kilograms of cocaine at a time, Munera said, "I understand. It's better for them. They can't be all over the place with twenty, ten . . . ." Finally, they discussed the profits earned from selling a kilogram of cocaine, with Munera stating, "many times you're making six thousand, four thousand but with a lot of back and forth."

CS and Munera next met on January 21, 2020. During this recorded meeting, CS told Munera that the cocaine was set to arrive in February. When CS asked how much Munera wanted, Munera again reiterated that it depended on the price and stated that he was currently getting it at "two eight," meaning $28,000 a kilogram,

and that he got around twenty kilograms of cocaine monthly. CS believed that Munera, in an attempt to get a better deal for himself, was giving him a fake price to try and get CS to sell to him even lower. Munera told CS that the cocaine also had to be good quality. After some back and forth, CS agreed to a price of $27,000 a kilogram. He informed Munera that if he could front $200,000 to cover the transportation cost of the cocaine, there would be no rush to pay back the rest of the money.

On February 12, 2020, CS and Munera met again in anticipation of the drug transaction set to occur the following day. They discussed logistics, including how much money Munera was going to pay up front and where the transaction would occur. Munera mentioned that he had been shorted on cocaine in the past. During the meeting, undercover DEA agents, posing as CS's cocaine suppliers, showed Munera fake kilogram packages of cocaine, as well as a photo of an open kilogram package.[2]

CS and Munera met the following day, February 13, 2020, at Munera's apartment building to complete the transaction. Munera did not want to conduct the deal on the street, so CS, wearing a recording device, went up to his apartment to check that Munera had the promised $200,000 in cash. CS observed the cash, which

---

[2] CS testified that he made realistic-looking fake kilogram packages for the DEA to show Munera by wrapping wood in plastic wrap.

- 5 -

was packaged in bundles of $10,000 and $50,000, and testified at trial that drug money is usually packaged like that. Munera told CS to take a photo of the cash as proof for the drug suppliers. CS then left the apartment, without the money, and returned to the undercover agents. Eventually, CS reentered the apartment building with the undercover agents to conduct the transaction. The agents carried in the bag containing the fake cocaine, and Munera reassured them that "[t]he money [is] all good. It's there." After the agents handed Munera the bag, he left the lobby to bring it back to his apartment and to retrieve the $200,000. Munera was arrested in the stairwell, still carrying the bag of sham cocaine, and $200,000 was later recovered from his apartment.

## B. Procedural History

Following his arrest, a grand jury indicted Munera on one count of attempting to possess with intent to distribute five kilograms or more of cocaine. During pretrial proceedings, the government, at Munera's request, interviewed CS to learn more about why he decided to approach Munera at the billiards bar. CS explained that when he worked with Fabio Quijano ("Quijano") in 2016 and 2017, Quijano purchased kilograms of cocaine from a man called "Pikachu," whom he had grown up with in Colombia. CS stated that he never met Pikachu in person. After CS heard someone refer to Munera as Pikachu in the bar, CS approached him.

Subsequently, the government interviewed Quijano, who was then under indictment for drug trafficking and money laundering offenses committed between 2018 and 2020. During his proffer, Quijano acknowledged that he knew Munera but did not conduct drug activity with him. Anticipating that Quijano would assert a Fifth Amendment privilege if called to testify, Munera requested use immunity for Quijano. After the government refused to provide said immunity, Munera requested that the district court order the government to do so. The district court denied Munera's request at the final pretrial conference, explaining that "there [wa]s no evidence that the prosecution withheld immunity in an attempt to distort the factfinding process."

At trial, Munera admitted to the underlying offense conduct but advanced an entrapment defense. Munera called his girlfriend, Estefania Holguin Builes ("Holguin"), to testify about the pressure CS placed on Munera leading up to the transaction in February 2020. During her testimony, the government objected to various responses based on her lack of personal knowledge or on hearsay grounds. Most of the government's objections to Holguin's testimony were sustained. After a four-day trial, the jury convicted Munera on the sole count.

At sentencing, Munera argued that he met the eligibility criteria for safety valve relief based on his trial testimony. The district court disagreed, finding that the safety valve

adjustment did not apply because Munera failed to prove by a preponderance of the evidence that his testimony at trial was truthful and because "he certainly did not give all of the background information with respect to his participation in this offense during the trial."  Munera received a sentence of 120 months' imprisonment.  This appeal followed.

## II. Discussion

### A. Use Immunity

We begin with Munera's claim of error related to use immunity.  Munera contends that the district court's refusal to order the government to grant Quijano use immunity resulted in a denial of due process and an unfair trial.  Specifically, Munera argues that, had Quijano testified, his testimony would have directly contradicted CS as to Munera's predisposition to engage in drug trafficking -- thereby corroborating Munera's own testimony in support of his entrapment defense -- and would have called the credibility of CS, the main government witness, into question.

On appeal, we review the denial of immunity de novo and the factual findings underpinning the district court's decision for clear error.  See United States v. Catano, 65 F.3d 219, 224, 226 (1st Cir. 1995); see also United States v. Straub, 538 F.3d 1147, 1156 (9th Cir. 2008) (explaining that "[t]he question of

whether a district court erred by refusing to compel use immunity is a mixed question of law and fact").

We have previously explained that "[t]he power and discretion to immunize witnesses lies primarily with the prosecution." United States v. Berroa, 856 F.3d 141, 159 (1st Cir. 2017); see United States v. Angiulo, 897 F.2d 1169, 1191 (1st Cir. 1990) (recognizing "that the power to grant witness immunity" is vested in the executive branch). A district court may circumvent the government's discretionary call only in the rare circumstance that "a prosecutor abuses [his or] her discretion by intentionally attempting to distort the fact-finding process," thus violating a defendant's due process rights. Angiulo, 897 F.2d at 1191-92; see Berroa, 856 F.3d at 159. Such distortion can occur "if the prosecutor purposefully withholds use immunity to hide exculpatory evidence from the jury." Berroa, 856 F.3d at 159 (quoting United States v. Castro, 129 F.3d 226, 232 (1st Cir. 1997)).

At the outset, we note that our case law makes clear that where the government offers a plausible reason for denying use immunity to a defense witness, such an assertion "adequately deflects any insinuation that the government's handling of [the] witness was motivated by the sole purpose of keeping exculpatory evidence from the jury." See Castro, 129 F.3d at 233 (crediting "government's desire not to hinder 'state or federal charges of

possession of controlled drugs and trafficking [that] could still be brought [against the witness]'" (first alteration in original)). Here, the government's stated reason for refusing to give Quijano use immunity -- avoiding potential obstacles to Quijano's prosecution on pending federal charges -- is exactly the type of rationale that we have continuously recognized as fending off a claim of prosecutorial misconduct. See Curtis v. Duval, 124 F.3d 1, 10 (1st Cir. 1997) ("[W]e cannot peer behind the prosecution's plausible assertion of a legitimate interest in keeping the way clear for a possible future prosecution [of a witness]."); Angiulo, 897 F.2d at 1193 (explaining that the government's "desire not to hinder possible state and federal prosecutions . . . show[s] that the government's conduct was motivated by something other than the sole desire to keep [the witness]'s exculpatory testimony from the jury"); United States v. Mackey, 117 F.3d 24, 28-29 (1st Cir. 1997) (recognizing the government's interest in avoiding risk to possible future prosecution of a witness as a legitimate justification for denying use immunity). Notably, Munera does not contend that the government acted in bad faith in denying Quijano use immunity. Thus, given Munera's concession, the government's good faith justification for denying use immunity to Quijano would normally end our inquiry.

Nevertheless, relying primarily on Ninth Circuit jurisprudence,[3] Munera asks us to balance his interest in Quijano's immunized testimony against the government's interest in withholding immunity to decide whether a due process violation occurred. In effect, this argument invokes the so-called "effective defense" theory, which "posits that a strong need for exculpatory testimony can override even legitimate, good faith objections by the prosecutor to a grant of immunity." Mackey, 117 F.3d at 28. We have repeatedly rejected this theory; Castro, for example, explained that the theory "is not good law in this circuit and [a defendant] cannot profit by it." 129 F.3d at 232 (stating that the effective defense theory has been "interred"); accord Curtis, 124 F.3d at 9; Mackey, 117 F.3d at 28. To the extent the Ninth Circuit's doctrine embraces the effective defense theory, we reject it.

---

[3] Citing United States v. Westerdahl, 945 F.2d 1083 (9th Cir. 1991), Munera argues that the factfinding process may be distorted when the government relies on immunized testimony for its case but then refuses to grant use immunity to defense witnesses. However, Munera fails to reconcile the Ninth Circuit's more lenient prosecutorial misconduct standard with this circuit's existing precedent. Compare id. at 1086 (requiring a defendant to "show that the evidence sought from the nonimmunized witness was relevant and that the government distorted the judicial fact-finding process by denying immunity to the potential witness" (emphases added)), with Angiulo, 897 F.2d at 1193 (requiring a defendant to show that the government "intentionally distort[ed] the fact-finding process by deliberately withholding immunity from certain prospective defense witnesses for the purpose of keeping exculpatory evidence from the jury" (emphases added)).

Without in any way undercutting our rejection of the effective defense theory, we acknowledge that Mackey may have left open the possibility of an exceedingly narrow "exception" to that rejection in circumstances involving "very extreme facts." 117 F.3d at 28. But see Castro, 129 F.3d at 232 (categorically rejecting the effective defense theory without any reference to a possible exception). That case described a hypothetical situation in which "the prosecutor has only a trivial interest in withholding immunity and -- to avoid a complete miscarriage of justice -- the defendant has an overwhelming need for specific exculpatory evidence that can be secured in no way other than through the grant of immunity." Mackey, 117 F.3d at 28. Munera's arguments do not bring this case anywhere close to Mackey's hypothetical.

First, the government's interest in withholding use immunity for Quijano was far from "trivial." Id. On the contrary, we have routinely recognized as nontrivial the government's "legitimate interest in keeping the way clear for a possible future prosecution." Curtis, 124 F.3d at 10 (emphasis added); see Mackey, 117 F.3d at 28 (same); Castro, 129 F.3d at 233 (same); Angiulo, 897 F.2d at 1191 (same). Here, Quijano was already under indictment for serious offenses, and the government had a legitimate interest in avoiding potential obstacles to his prosecution. Munera argues that the government's interest in safeguarding its then-ongoing prosecution of Quijano should have

- 12 -

given way because Quijano was not under indictment for the activities in question, which occurred in 2016 and 2017; the prosecution of said activities would soon be barred by the statute of limitations; the government has not made any effort to prosecute Quijano for these alleged activities; and use immunity would not necessarily bar prosecution based on evidence obtained independent of his testimony. But none of the first three points make it implausible that a future prosecution of Quijano, which would be hampered by immunization, was "possible" at the time of the immunity decision, see Curtis, 124 F.3d at 10, and the final point would be true in any case involving use immunity. The government's strong interest in withholding immunity alone brings this case outside the Mackey hypothetical, which in turn ends the matter.

Even going beyond that, Munera has not shown "an overwhelming need for specific exculpatory evidence that can be secured in no way other than through the grant of immunity" and that is necessary "to avoid a complete miscarriage of justice." Mackey, 117 F.3d at 28. Munera contends that he needed Quijano's testimony to contradict and discredit CS, since the government purportedly relied exclusively on CS's testimony to establish Munera's predisposition to engage in drug trafficking based on his prior work with Quijano. Munera's argument falls short for several reasons. His claim of "overwhelming need" is undercut by the fact that he testified to the same exculpatory evidence that he was

hoping to obtain through immunized testimony -- that he never sold drugs to Quijano -- thus establishing that the evidence was available other than through a grant of immunity. Nor did the government rely exclusively on CS for predisposition evidence. In fact, the government introduced transcripts of recordings where Munera is caught discussing, among other things, his Mexican drug supplier, how much a kilogram of cocaine costs him, his profits from drug sales, and other intricacies of the drug trade. Although Munera contends that CS coached him about the drug trade during their unrecorded meetings, he fails to adequately explain why he would then pretend to be an experienced drug dealer when interacting with CS given that CS allegedly knew that he was not.[4] These recordings evidenced Munera's predisposition to engage in drug trafficking and bolstered CS's credibility with respect to his testimony about his dealings with Munera. Given this evidence, Munera cannot show an "overwhelming need" for Quijano's immunized testimony to avoid "a complete miscarriage of justice." Id.

## B. Limiting Holguin's Testimony

Munera next contends that the district court erred when it precluded Holguin from testifying about the pressure CS placed

---

[4] When pressed at oral argument, Munera's counsel explained that Munera held himself out as an experienced drug dealer as a negotiation tactic to maximize his profits. We cannot square this desire to maximize profits with his claim that Munera lacked a predisposition to engage in drug trafficking.

- 14 -

on Munera, thus undermining his entrapment defense.  He claims that Holguin was wrongfully prevented from testifying about what he told her CS said about his living conditions; the effect of CS's struggles on him; and his emotional state when discussing CS's struggles -- despite his proffer that the evidence was offered for his state of mind rather than the truth.

We review the district court's evidentiary rulings for abuse of discretion.  See United States v. Concepcion-Guliam, 62 F.4th 26, 32 (1st Cir. 2023).  "[W]hen judicial action is taken in a discretionary matter, such action cannot be set aside by a reviewing court unless it has a definite and firm conviction that the court below committed a clear error of judgment in the conclusion it reached upon a weighing of the relevant factors." United States v. Kilmartin, 944 F.3d 315, 335 (1st Cir. 2019) (quoting Schubert v. Nissan Motor Corp. in U.S., 148 F.3d 25, 30 (1st Cir. 1998)).  Further, "[w]e will not reverse if it is highly probable that the error did not contribute to the verdict." United States v. Ocasio-Ruiz, 779 F.3d 43, 47 (1st Cir. 2015).

We first dispatch Munera's claim that Holguin was prevented from testifying about his emotional state and demeanor. Contrary to his assertion, Holguin was correctly permitted to testify about her observations of Munera's demeanor.  See Concepcion-Guliam, 62 F.4th at 32 (permitting detective's testimony about his observations).  The district court even said,

- 15 -

"She can testify as to his demeanor." For example, the district court allowed the following from Holguin:

- "[Munera's] attitude, the way he felt, was, oh, it hurts me a lot to see [CS] when he tells me that, when I hear this."

- "I noticed [Munera] to be very stressed. I noticed that he was having a lot of angst. Even like at times he didn't have -- he wasn't really willing to talk to me."

- "[Munera] continued feeling with a lot of angst."

- "[Munera] has always been a very calm type of person."

While testimony about personal observations is permissible under our rules of evidence, the district court correctly drew a line by prohibiting Holguin from testifying about Munera's internal emotional state, which she had no personal knowledge of. See Fed. R. Evid. 602 ("A witness may testify to a matter only if evidence is introduced sufficient to support a finding that the witness has personal knowledge of the matter."); Concepcion-Guliam, 62 F.4th at 32 (permitting testimony about witness's observations where there was no mention of the defendant's state of mind). For example, she was prevented from testifying about how Munera was impacted by hearing CS's struggles and what emotional state he was in when he relayed that information to her. The district court also correctly prevented Holguin from testifying about what Munera told her he was feeling since such

- 16 -

testimony was clearly offered for the truth -- proving that CS's alleged pleas to do a drug deal impacted Munera -- and thus constituted inadmissible hearsay.[5]  See Fed. R. Evid. 801; United States v. Tuesta-Toro, 29 F.3d 771, 776 (1st Cir. 1994) (explaining that admission of an out-of-court statement offered for proving the truth of the matter asserted constitutes error).

Munera next contends that Holguin was impermissibly constrained from testifying about CS's reported living conditions and his business proposition for Munera, but his contentions lack support.  Here, too, the district court carefully policed the rules of evidence.  As explained supra, the district court did not abuse its discretion by precluding Holguin from testifying to facts where there was no foundation laid for her personal knowledge of said facts, such as what CS was experiencing, how CS was describing his financial hardship, what CS's living conditions were, and what business CS was proposing to Munera.  However, Holguin was permitted to testify to what Munera told her that CS told him about his financial and economic problems and about the business opportunity.  For example, she was permitted to say that Munera recounted to her that CS told him that he "was in a lot of trouble," that "he was having financial hardship," "that his family was going

---

[5] Munera's sole argument on appeal is that Holguin's testimony was admissible as nonhearsay.  Thus, we take no position on whether said testimony was admissible under an exception to the rule against hearsay, since any such argument is waived.

through financial hardship as well," "that he would bring this up very often," that "[h]e needed to solve these financial problems at once," that "not only was he going hungry but his family was going hungry as well," that "he was not living in a very good living conditions [sic]," that "he was living worse than a rat," and "that it was business that was related to drugs." This testimony was properly admitted for its effect on the listener's state of mind -- here, Munera. See United States v. Feliz, 794 F.3d 123, 132-33 (1st Cir. 2015) (explaining that "testimony . . . offered to show the effect of the words spoken on the listener . . . is a nonhearsay utterance because it is not being used to prove the truth of the matter asserted"). Despite Munera's claims to the contrary, the record makes clear that Holguin was permitted to testify about the topics now complained of, within the constraints imposed by the rules of evidence. Thus, we discern no abuse of discretion in the district court's evidentiary rulings.

## C. Sentencing

On appeal, Munera advances two sentencing challenges. We begin with his first argument: that the district court erred in denying him safety valve relief.

### 1. Safety Valve

Before proceeding to the merits of Munera's claim, we pause to provide some context. In 1994, Congress enacted the

safety valve to provide relief to certain first-time drug trafficking offenders facing mandatory minimum sentences. See 18 U.S.C. § 3553(f); United States v. Ortiz-Santiago, 211 F.3d 146, 150 (1st Cir. 2000). When applicable, the safety valve reduces a defendant's offense level by two points and permits the sentencing judge to disregard the mandatory minimum sentence provided in certain drug trafficking statutes. See Ortiz-Santiago, 211 F.3d at 150. Although there are five requirements that a defendant must meet to obtain safety valve relief, only the fifth and final criterion of the statute, as amended in 2018, is at issue here. It requires that "not later than the time of the sentencing hearing, the defendant has truthfully provided to the Government all information and evidence the defendant has concerning the offense or offenses that were part of the same course of conduct or of a common scheme or plan."[6] § 3553(f)(5); U.S.S.G.

---

[6] The first four safety valve requirements are:

> (1) the defendant does not have more than 1 criminal history point, as determined under the [S]entencing [G]uidelines;
>
> (2) the defendant did not use violence or credible threats of violence or possess a firearm or other dangerous weapon (or induce another participant to do so) in connection with the offense;
>
> (3) the offense did not result in death or serious bodily injury to any person;

§ 5C1.2(a)(5). Munera, as the defendant, "bears the burden of proving, by a preponderance of the evidence, that he has satisfied this requirement." Padilla-Colón, 578 F.3d at 30.

Turning to the case at hand, Munera contends that the district court failed to make an "independent determination" as to his eligibility for relief. As evidence, he points to the fact that the district court referenced a probation recommendation that did not exist, as well as the court's failure to make specific factual findings supporting its decision. He also claims that the district court erred by crediting the government's arguments opposing relief because said arguments were "insufficient."

We review a district court's safety valve determination de novo when the determination rests on conclusions of law and for clear error when it rests on findings of fact. See id. at 29. Clear error review is "exceedingly deferential"; thus we will not "disturb either findings of fact or conclusions drawn therefrom unless the whole of the record compels a strong, unyielding belief

---

> (4) the defendant was not an organizer, leader, manager, or supervisor of others in the offense, as determined under the [S]entencing [G]uidelines and was not engaged in a continuing criminal enterprise, as defined in section 408 of the Controlled Substances Act.

United States v. Padilla-Colón, 578 F.3d 23, 30 n.4 (1st Cir. 2009); see § 3553(f)(1)-(4); § 5C1.2(a)(1)-(4).

- 20 -

that a mistake has been made." United States v. Matos, 328 F.3d 34, 39-40 (1st Cir. 2003). Because "evaluating witness testimony typically involves fact-sensitive judgments and credibility calls," such decisions "fit comfortably within the margins of the clear error standard." Id. at 40.

As to the district court's decision-making process, it is clearly established in our case law that a sentencing judge must independently determine whether a defendant is eligible for safety valve relief. See United States v. White, 119 F.3d 70, 73 (1st Cir. 1997); United States v. Miranda-Santiago, 96 F.3d 517, 529 (1st Cir. 1996). Additionally, such a finding should "rest[] on more than 'bare conclusions.'" United States v. Bravo 489 F.3d 1, 12 (1st Cir. 2007) (quoting Miranda-Santiago, 96 F.3d at 529). Nevertheless, "bare conclusion[s]" may suffice if there is "easily recognizable support in the record" for the finding. Miranda-Santiago, 96 F.3d at 529.

Munera first argues that we cannot find that the district court made an independent determination where the court adopted a recommendation from the probation office that was nonexistent. While discussing the safety valve, the district court said, "The Court is satisfied that the recommendation of the Probation Office is appropriate." As Munera points out, the probation office did not take a stance on his eligibility for relief, thus this statement was made in error. Munera's contention might have had

teeth if the district court stopped there, but the court continued on and stated the following:

> The safety valve adjustment does not apply here. The Court agrees with the government's argument that, based upon a preponderance of the evidence standard . . . the defendant's testimony was not truthful and that he does not satisfy the fifth criterion of the so-called safety valve application. He did not give completely truthful evidence and he certainly did not give all of the background information with respect to his participation in this offense during the trial.

The record establishes that the district court did not merely defer to the probation office on the safety valve issue. Rather, it made an eligibility determination after overseeing a four-day jury trial, where the defendant testified, and after receiving sentencing memoranda and hearing oral argument from both sides on the safety valve issue. See Matos, 328 F.3d at 40 (affirming the district court's eligibility decision after noting that the district court "carefully examined" witness testimony and listened to the parties' credibility arguments); cf. Bravo 489 F.3d at 12 (remanding the district court's safety valve determination where the defendant's eligibility arguments were summarily denied). While the district court did not make specific factual findings, their absence alone does not constitute error -- contrary to Munera's claim -- given that the court explicitly credited the government's argument opposing relief, and thus "easily

- 22 -

recognizable support in the record" exists for the district court's decision.  See Miranda-Santiago, 96 F.3d at 529.

Munera next argues that the district court erred when it credited the government's argument opposing relief because the government failed to "'come forward with some sound reason to suggest' that [Munera]'s proffer [wa]s untruthful or incomplete." See United States v. Martinez, 9 F.4th 24, 37 (1st Cir. 2021) (quoting Miranda-Santiago, 96 F.3d at 529 n.25).  The record clearly establishes, however, that, in its memorandum and argument at sentencing, the government pointed out various ways -- citing specific examples -- that Munera's testimony was contradicted, implausible, or otherwise incomplete.[7]  We have previously held that such a showing by the government, if credited, is more than sufficient to justify denial of safety valve relief.  See United States v. Marquez, 280 F.3d 19, 24-25 (1st Cir. 2002).

---

[7] For example, the government highlighted the inconsistency between Munera's trial testimony -- where he claimed that, prior to the transaction with CS, he had never engaged in drug trafficking -- with his statements to CS during their recorded conversations -- where he claimed, among other things, that he had a Mexican cocaine supplier and discussed the drug trade like an experienced trafficker.  The government also emphasized the implausibility of Munera's claim that he was going to temporarily hold the drugs for CS by pointing to the fact that Munera negotiated for a more favorable sale price and was concerned about the quality of the drugs, both of which are inconsistent with him merely providing storage.  Additionally, the government cited specific evidence that Munera did not provide during his testimony, including details about his Mexican source of supply, customers, and prior involvement with East Boston cocaine traffickers.

Despite Munera's stated challenge, the essence of his argument appears to be that we should disregard the government's reasonable interpretation of the facts, which the district court credited, in favor of his own. We refuse to do so. "The default rule is that when more than one sensible interpretation of a particular set of circumstances can supportably be drawn, a sentencing court's decision to credit one alternative and reject another cannot be deemed clearly erroneous." Matos, 328 F.3d at 40-41; see also United States v. Rodríguez-Ortiz, 455 F.3d 18, 25 (1st Cir. 2006) (concluding that the district court did not err when it credited a government witness's testimony over the defendant's in denying safety valve relief); Marquez, 280 F.3d at 24-25 (explaining that the district court did not err in finding the defendant ineligible for safety valve relief where his answers were "incredible" and strained credulity). Our review of the record reveals no error here. The government's evidence, and the record as a whole, provides ample support for the district court's finding that Munera failed to meet the safety valve's complete and truthful disclosure requirement.

## 2. District Court's Sentencing Comments

Munera advances one final argument, raised for the first time on appeal. He contends that, because the district court did not advance a factual basis for denying safety valve relief, it is possible that improper bias may have tainted the court's decision.

As evidence, Munera points to the following remarks from the district court during the sentencing hearing:

> And to add insult to injury, you came into this country illegally and remained an illegal alien while you committed this and no doubt other crimes.  For all of that, you deserve a long prison sentence, not only to deter you from ever committing a similar crime, but also to deter anyone else who thinks that he can abuse our immigration laws and spread poison in our midst without serious consequences.  It won't happen on my watch.

To the extent that Munera argues that his sentencing hearing may have been tainted by what he asserts was bias based on the judge's reference to his immigration status, we note that he failed to object below and thus we review for plain error on appeal.  See United States v. Rondón-García, 886 F.3d 14, 20 (1st Cir. 2018) (explaining that a defendant's unpreserved claim that the sentencing court relied on an impermissible factor at sentencing is reviewed for plain error).  To prevail, a defendant must establish: "(1) that an error occurred (2) which was clear or obvious and which not only (3) affected the defendant's substantial rights, but also (4) seriously impaired the fairness, integrity, or public reputation of judicial proceedings." United States v. Gilman, 478 F.3d 440, 445 (1st Cir. 2007).  "In the sentencing context that translates to a requirement that a defendant must paint a picture that illuminates 'a reasonable probability that, but for the error, the district court would have

- 25 -

imposed a different, more favorable sentence.'"  Id. at 447
(quoting United States v. Turbides-Leonardo, 468 F.3d 34, 39 (1st
Cir. 2006)).  Here, Munera makes "no attempt to bear his burden
under plain-error review," and thus any such argument is waived.
United States v. Franklin, 51 F.4th 391, 400 (1st Cir. 2022).

### III. Conclusion

For the foregoing reasons, we **affirm**.